[No. 40777-9-II.   Division Two.   July 17, 2012.]

THE STATE OF WASHINGTON, *Respondent*, v. MICHAEL JOHN
PIERCE, *Appellant*.

534

*Mark A. Larranaga* (of *Walsh & Larranaga*) for appellant.

*Scott W. Rosekrans, Prosecuting Attorney,* and *Thomas A. Brotherton* and *Christopher R. Ashcraft, Deputies,* for respondent.

¶1 WORSWICK, C.J. — When a person in custody unequivocally requests a lawyer, police are obligated under CrR 3.1(c)(2) to make all reasonable efforts to put that person in contact with a lawyer at the earliest opportunity. The remedy for violating this rule is suppression of the evidence tainted by the violation. Furthermore, prosecutors have a duty to secure a verdict free of prejudice and based on reason. A prosecutor's appeal to the jury's passion and prejudice violates this duty.

¶2 Pat and Janice Yarr were murdered, and their house was burned down. While the house was still burning, Michael Pierce's image was captured on an automatic teller machine (ATM) surveillance video using the Yarrs' debit card. The police arrested Pierce for theft of the Yarrs' debit card, but Pierce requested a lawyer when the police accused him of murdering the Yarrs. The police then booked Pierce into jail, but corrections staff made no efforts to put him in contact with a lawyer. Five hours later, Pierce made incriminating statements. The trial court admitted these incriminating statements at Pierce's trial.

¶3 During rebuttal closing argument, the prosecutor appealed to the jury's passion and prejudice by asking it to place itself in the shoes of two victims of a brutal killing. And the prosecutor further appealed to the jury's passion and prejudice by arguing matters outside the evidence in speculating on Pierce's thought process leading up to the crime and fabricating an emotionally charged story of how the victims might have struggled with Pierce and pleaded for mercy.

¶4 Based on these errors, we reverse Pierce's convictions for two counts of first degree felony murder; one count each of first degree burglary, first degree robbery, first degree

arson, theft of a firearm, second degree unlawful possession of a firearm, and second degree theft; and remand for a new trial.

¶5 Furthermore, we address the prosecutor's statements at trial implying that voting to acquit Pierce was akin to adultery or treason, and that the prosecutor represented the victims. We caution that while not reversible error under the facts of this case, these arguments should not be repeated on retrial. And because the issue will likely recur on remand, we address Pierce's motion to disqualify the Jefferson County public defender's association as counsel, finding no error.[1]

## FACTS

### A. *The Crimes*

¶6 Pat and Janice Yarr were murdered in the evening of March 18, 2009. They each were shot in the head, and their house was set afire. There were no eyewitnesses to these events.

¶7 Earlier on March 18, around 6:35 PM, Pierce had shoplifted a realistic-looking pellet pistol from a hardware store. At that time, Pierce was wearing a waist-length jacket and a distinctive starburst-pattern baseball cap.

---

[1] Pierce also argues that errors during jury selection denied him a fair trial, the trial court improperly admitted late-disclosed ER 404(b) evidence, the jury relied on extrinsic evidence, and cumulative error denied him a fair trial. Pierce additionally argues in a statement of additional grounds that he was denied a fair trial when two jurors discussed the case during deliberations outside the jury room. Because we reverse on other grounds, we do not consider these arguments.

Pierce further argues that he received ineffective assistance of counsel when his counsel failed to object to the court informing prospective jurors that the case was a noncapital case. We hold that Pierce has not shown sufficient prejudice to support a claim of ineffective assistance of counsel. But it is error to inform the jury that the death penalty is not being sought and this error should not be repeated on retrial. *State v. Townsend*, 142 Wn.2d 838, 846, 15 P.3d 145 (2001).

Pierce additionally argues that the trial court erred by failing to grant his motion to change venue. We discern no error on this point. But on retrial, when deciding the matter of venue, the trial court must account not only for the pretrial coverage of this case but also for coverage of Pierce's conviction, the reversal of his conviction, and the fact that prospective jurors may be aware of information we now rule inadmissible.

¶8  At around 7:45 PM, a witness saw a large man[2] on the side of highway 101 near the Yarr house. The witness believed the man was wearing a black jacket that went below his waist and a black hooded sweatshirt underneath. When the witness slowed down and attempted to contact the man, the man pulled his hood to hide his face.

¶9  At 8:11 PM, a camera at a nearby ATM showed Pierce in the same starburst-pattern hat, concealing his face with his T-shirt, withdrawing $300 using the Yarrs' debit card. Also around 8:11 PM, a witness driving past the Yarr house saw a fire there.

¶10  After the house fire was extinguished, the Yarrs' bodies were located inside. The Yarrs had each been shot in the head in a manner consistent with high velocity rifle shots. Accelerants were found in the carpet beneath their bodies. Slugs retrieved from the crime scene were consistent with 25.06 caliber rifle rounds. Pat Yarr had owned a scoped 25.06 rifle that was never recovered.

## B. *Pierce's Arrest and Request for an Attorney*

¶11  Based on the footage from the ATM camera, police arrested Pierce for theft of the Yarrs' debit card. Detectives interrogated Pierce about the theft, and Pierce denied stealing the debit card. The interrogating detectives then accused Pierce of murdering the Yarrs, at which point Pierce said, "If you're . . . trying to say I'm doing [sic] it I need a lawyer. I'm gonna need a lawyer because it wasn't me. You're wrong." Def.'s Ex. 3, at 19. The police then escorted Pierce across the street to jail. Although the normal jail procedure is to put a prisoner who has requested an attorney in immediate contact with one, Pierce was not put in contact with an attorney. The jail procedure when a prisoner requests to speak to an attorney after normal business hours is for jail staff at the booking desk to dial the home phone numbers of the public defenders for the prisoner. Jail staff did not follow this procedure for Pierce.

---

[2] Other evidence established that Pierce is a large man.

¶12 Approximately five hours later, Pierce requested to speak to the detectives again. Pierce offered to tell the detectives the shooter's name in exchange for immunity. Although the detectives did not promise Pierce immunity, Pierce told them that the shooter was "Mr. B." 2 Report of Proceedings (RP) (Jan. 29, 2010) at 254. He also said that Mr. B. had gone to the Yarrs to borrow money because they owed Mr. B. money.

¶13 Pierce then said both that he had waited at the shooter's house and that he waited three miles down the road when the shooter went to the Yarrs' house. Pierce also said that the shooter had returned covered in blood, and he had helped the shooter wash off. Pierce further said that he had watched the shooter pour gasoline over the shooter's clothes and burn them. Pierce additionally stated that the shooter returned with a scoped rifle. The fact that a scoped rifle was likely used in the killings had not yet been made public.

## C. *Pretrial Proceedings*

¶14 The State charged Pierce with two counts of aggravated first degree premeditated murder; two counts of first degree felony murder; and one count each of first degree robbery, first degree burglary, first degree arson, theft of a firearm, second degree theft, and second degree unlawful possession of a firearm. Pierce moved to disqualify Jefferson Associated Counsel (JAC), the organization responsible for indigent criminal defense in Jefferson County, from representing him. He argued that JAC had a conflict of interest because it had, on 28 separate cases, represented Tommy Boyd, a witness for the State whom Pierce might accuse of committing the murders. The trial court found that the current matter was not the same as or substantially related to the matters on which JAC had represented Boyd, and it denied the motion.

¶15 Pierce further moved to suppress the statements he made to the detectives after invoking his right to counsel,

asserting that he had not been put in contact with an attorney as required by CrR 3.1(c)(2).[3] The trial court ruled the statements were admissible, finding that (1) Pierce had made an equivocal request to speak to an attorney and (2) the jail had made the necessary reasonable efforts to put Pierce in communication with a lawyer.

## D. *Trial*

¶16 At trial, witnesses testified to the above-noted facts. Tommy Boyd, whom police determined was the "Mr. B." Pierce had accused of being the shooter, testified that Pierce had come to Boyd's motor home on the evening of March 18. Boyd further testified that Pierce had asked him to get Pierce some methamphetamine.

¶17 During rebuttal closing argument, the prosecutor argued about how unexpected the crimes must have been for the victims, stating:

> It was just another day. Never in their wildest dreams or in their wildest imagination or in their wildest nightmares would they have thought what was going to happen to them probably 14 hours after they rolled out of bed, 14, 15 hours after [sic] rolled out of bed, that they would be forced to lay facedown in their own kitchen in their own home to be robbed by somebody that knew them, somebody who they had given a job to, somebody who they had given money to, and they would shoot them in the back of their heads. Never in their wildest dreams would they have imagined that, and never in your wildest nightmares would you imagine something like that happening to you, in your own home, the place where you grew up, where you raised kids, where you sent them to school, where you hoped to go ahead and play with your grandkids. Never did they imagine that. Never.

8 RP (Trial) at 1086-87. Pierce did not object to this argument.

---

[3] CrR 3.1(c)(2) provides, "At the earliest opportunity a person in custody who desires a lawyer shall be provided access to a telephone, the telephone number of the public defender or official responsible for assigning a lawyer, and any other means necessary to place the person in communication with a lawyer."

¶18 Also during rebuttal, the prosecutor argued in the first person what Pierce's thought process must have been during the crimes:

> So he's thinking, "Alright. Who do I know in Quilcene that has money?" Okay. Well, we know he knows Tommy Boyd, and we know that he knows Mike Donahue, and we know they don't have any money, okay? "But who do I know in Quilcene that has money? Well, the Yarrs. I know they got money. And they have cash, because they paid me in cash. I can go up there and get some money. But there's one problem: I don't want to work for it. I want my meth now. I don't want to work for it and then go get it; I want my meth now, so that is a problem. And I'm pretty sure Pat's just not going to give it to me without me working for it. So, hmm, I've got to get some money. He's not going to give it to me, so I need a gun, but I don't know anybody that has a gun."

8 RP (Trial) at 1099. The prosecutor continued:

> He's trying to screw up the courage. It's like, "Okay, I got my gun. Looking at the Yarr house. Now, am I going to do this or am I not going to do this? I need to wait for a little bit." Or maybe he's watching the Yarr house from that vantage point because it is March and the, and the, and the leaves aren't out yet and maybe he's, maybe he's watching to see who's there. Maybe he's watching Greg Brooks. Greg says he was there some time between 7:00, and 7:10, give or take, so maybe he's standing on the road saying, "Somebody just drove up. I guess I better wait." So he's down there on 101, he's got his car hid and he's thinking, "Okay, I got to do this thing. I got to do this thing," alright? And then he hears a car coming. And, now, he's waited a little bit longer because it's getting a little bit darker—

8 RP (Trial) at 1104-05. At this point, Pierce objected that there were no such facts in evidence and the trial court, without ruling on the objection, admonished the jury that the attorneys' arguments were not evidence.

¶19 The prosecutor finally told the jury an emotionally charged, but largely speculative, version of what must have happened at the scene of the crime:

Okay. So [sic] overpowers Pat. Probably doesn't want to do anything at this point to go ahead and place his wife in any kind of jeopardy or danger, "Give me the money." "What do you mean you don't have any money," you know. "I don't have any money," you know. "But," you know, "don't hurt us. Don't hurt my wife. Don't hurt me. I'll give you my debit card. Please don't hurt us," okay? "I'll give you my debit card; please don't hurt us." Gives him the debit card, obviously gives him the PIN [(personal identification number)].

[Pat Yarr] probably said, "This ain't over. I know you. This ain't over." Okay? I betcha he was hot. Makes these two people lay down on their floor, in their home, in their kitchen, almost head-to-head, face-to-face where they can see each other. Where they look into their eyes. They can look into their eyes. "I can't leave any witnesses, especially one that'll probably kill me the next time he sees me." And he shoots. There's your premeditation. "Lay down on the floor. Say your goodbye's [sic]."

8 RP (Trial) at 1115-17. Pierce objected partway through this argument that it was unsupported by evidence and orally moved for a mistrial; the trial court overruled the objection but again instructed the jury that the attorneys' arguments were not evidence and that they should disregard arguments they found unsupported by the evidence.

¶20 The jury found Pierce guilty of two counts of first degree felony murder and one count each of first degree burglary, first degree robbery, first degree arson, theft of a firearm, second degree unlawful possession of a firearm, and second degree theft. Pierce appeals.

## ANALYSIS

### I. Access to a Lawyer under CrR 3.1(c)(2)

¶21 We first address Pierce's argument that the statements he made during his second interview with the detectives should have been suppressed based on the jail's failure to immediately put him in contact with an attorney as CrR 3.1(c)(2) requires. We hold (1) the trial court erred in

concluding that Pierce's request for an attorney was equivocal, (2) the trial court erred in concluding that jail staff took reasonable efforts to put Pierce in contact with an attorney, (3) Pierce's subsequent statements should have been suppressed, and (4) it was not harmless error to admit Pierce's statements.

¶22 In evaluating Pierce's arguments on this point, we look to the findings of fact and conclusions of law entered after the CrR 3.5 hearing. We treat unchallenged findings of fact following a CrR 3.5 hearing as verities on appeal. *State v. Lorenz*, 152 Wn.2d 22, 30, 93 P.3d 133 (2004). We review de novo whether the trial court derived proper conclusions of law from its findings of fact. *State v. Grogan*, 147 Wn. App. 511, 516, 195 P.3d 1017 (2008) (quoting *State v. Solomon*, 114 Wn. App. 781, 789, 60 P.3d 1215 (2002)).

## A. *Unequivocal Request for Attorney*

¶23 Pierce does not challenge the trial court's findings of fact, making them verities on appeal. But Pierce argues that the trial court erred by concluding that Pierce failed to unequivocally request an attorney. We agree with Pierce.

¶24 Pierce made an unequivocal request for an attorney after the police accused him of murdering the Yarrs, stating, "If you're . . . trying to say I'm doing [sic] it I need a lawyer. I'm gonna need a lawyer because it wasn't me." Def.'s Ex. 3, at 19. But the trial court concluded to the contrary: "Mr. Pierce never expressed a desire to talk to an attorney therefore the State was not obligated to provide him with the public defenders' home phone numbers." Clerk's Papers (CP) at 808. In a footnote, the trial court cited *State v. Whitaker*, 133 Wn. App. 199, 217-18, 135 P.3d 923 (2006), for the proposition "that an equivocal request for an attorney did not activate the requirements of CrR 3.1(c)(2)." CP at 808. Although the trial court did not explicitly conclude that Pierce's request for an attorney was equivocal, the trial court implicitly reached that conclusion by citing *Whitaker* for the stated proposition.

¶25 As the trial court correctly noted, a suspect's request for a lawyer must be unequivocal before CrR 3.1(c)(2) applies. *Whitaker*, 133 Wn. App. at 217-18. But the trial court erred in holding that Pierce's request was equivocal.

¶26 In contrast to Pierce's unequivocal request for an attorney, the *Whitaker* case presents an example of an equivocal request. There, Whitaker asked " 'when he could talk to an attorney.' " 133 Wn. App. at 216. But although the interrogating Federal Bureau of Investigation (FBI) agents informed Whitaker he could request an attorney "at that moment," Whitaker clarified that he was only asking about when in the process an attorney would be appointed. 133 Wn. App. at 216-17. Division One of this court held that Whitaker's statements were equivocal and therefore did not constitute a request for counsel invoking CrR 3.1(c)(2). 133 Wn. App. at 217-18.

¶27 The statement here was unlike that in *Whitaker*. Whitaker asked only when an attorney would be appointed, and he failed to ask for one immediately when the FBI agents told him he could do so. But here, Pierce stated that he was "gonna" need a lawyer, a statement hardly as equivocal as that in *Whitaker*.

¶28 Division One of our court recently held a request for counsel analogous to Pierce's to be an unequivocal assertion of the right to counsel under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). *State v. Nysta*, 168 Wn. App. 30, 40-42, 275 P.3d 1162 (2012), *petition for review filed*, No. 87491-3 (Wash. June 14, 2012).[4] Nysta said, " 'I gotta talk to my lawyer.' " 168 Wn. App. at 40. Division One held that this request was unequivocal because Nysta did not use such words as "if," "or," "maybe," or "perhaps." 168 Wn. App. at 42. While Pierce initially said he would need a lawyer "if" the police were going to accuse him of murder, he immediately followed with the statement, "I'm

[4] Washington cases make no distinction between an invocation of the *Miranda* right to counsel and a request for counsel that triggers CrR 3.1(c)(2).

gonna need a lawyer because it wasn't me." Def.'s Ex. 3, at 19. This was an unequivocal request for counsel analogous to that in *Nysta*.

¶29 We might hold otherwise if the police had not yet accused Pierce of murder. *See State v. Lewis*, 32 Wn. App. 13, 15-16, 20, 645 P.2d 722 (1982) (defendant's request for counsel equivocal where defendant said he " 'should' " have an attorney present " 'if this is going to get into something deep' " and had not yet been accused of a crime (emphasis omitted)). But when Pierce said he would need a lawyer "if" the police were accusing him of murder, the police had already leveled that accusation. Coupled with his immediately following statement that he was "gonna" need a lawyer, Pierce's conditional language did not render his request for counsel equivocal.

¶30 Cases from other jurisdictions bolster our conclusion that Pierce's request was unequivocal. The United States Court of Appeals for the Seventh Circuit provided a comprehensive analysis of the issue in *United States v. Lee*, 413 F.3d 622, 625-26 (7th Cir. 2005). There, the Seventh Circuit Court of Appeals recognized that statements such as " 'I can't afford a lawyer but is there any way I can get one?' " or " 'maybe I should talk to a lawyer' " or " 'I don't know if I need an attorney' " have been held to be equivocal requests for counsel under *Miranda*. *Lee*, 413 F.3d at 626 (quoting *Lord v. Duckworth*, 29 F.3d 1216, 1220-21 (7th Cir. 1994); *Davis v. United States*, 512 U.S. 452, 462, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994); *United States v. Buckley*, 4 F.3d 552, 558-59 (7th Cir. 1993)).

¶31 The Seventh Circuit Court of Appeals also noted several statements that have been held to be unequivocal requests for a lawyer, including, " 'I think I should call my lawyer'; 'I have to get me a good lawyer, man. Can I make a phone call?'; 'Can I talk to a lawyer? . . . I think maybe you're looking at me as a suspect, and I should talk to a lawyer. Are you looking at me as a suspect?' " *Lee*, 413 F.3d at 626 (quoting *Lord*, 29 F.3d at 1221 (quoting cases from the

Eleventh and Ninth circuits regarding unequivocal invocation to right to counsel)). The *Lee* court held that the question "Can I have a lawyer?" was also an unequivocal invocation of the *Miranda* right to counsel. 413 F.3d at 626.

¶32 The Colorado Court of Appeals reached the same conclusion regarding a statement even more analogous to Pierce's in *People v. Cook*, 665 P.2d 640, 643 (Colo. App. 1983). There, Cook said, " 'Oh, I guess I am going to need an attorney.' " 665 P.2d at 643. The Colorado Court of Appeals held that this statement was sufficient to invoke Cook's right to counsel. 665 P.2d at 643-44.

¶33 Pierce's statement "I'm gonna need a lawyer because it wasn't me" is analogous to that in *Cook*. Furthermore, Pierce's statement was distinguishable from the equivocal requests noted in *Lee* and analogous to the unequivocal requests noted therein. These cases, in addition to the Washington cases we cite above, demonstrate that Pierce unequivocally requested counsel. The trial court erred in concluding to the contrary.

## B. *No Reasonable Efforts under CrR 3.1(c)(2)*

■■ ¶34 Pierce also argues that the trial court erred by concluding that the police made reasonable efforts to put Pierce in contact with an attorney. We agree. This conclusion was erroneous because providing only the public defender's business number after regular business hours did not constitute "reasonable efforts."

¶35 In addressing the efforts jail staff took to put Pierce in contact with an attorney, the trial court found:

27. The business number for the public defender's office is posted by every phone the inmates are allowed to use.

28. Inmates in general population may use inmate phones to make free calls to the public defender's office business line.

29. When a defendant . . . requests to speak to an attorney after normal business hours, corrections officers escort

the defendant to the booking desk, dial the home phone numbers of the public defenders . . . .

30. The public defenders home numbers are kept in the booking area but are not given to inmates in order to protect the public defenders' privacy.

CP at 802. The trial court further found that Pierce made two phone calls to his girl friend before his second interview with the police. Again, because Pierce does not challenge the findings of fact, they are verities on appeal.

¶36 Based on these findings of fact, trial court concluded:

The State made reasonable efforts to put Mr. Pierce in contact with an attorney by allowing him to make two free phone calls to anyone he chose but because he never expressed a desire to talk to an attorney the State was not obligated to give him the after hours home phone numbers for the local public defenders.

CP at 808. But under the precedent of our courts, this conclusion was erroneous.

¶37 Under CrR 3.1(c)(2), "At the earliest opportunity a person in custody who desires a lawyer shall be provided access to a telephone, and the telephone number of the public defender or official responsible for assigning a lawyer, and any other means necessary to place the person in communication with a lawyer." We have held that "[a]lthough the rule does not require the officers to actually connect the accused with an attorney, it does require *reasonable efforts* to do so." *State v. Kirkpatrick*, 89 Wn. App. 407, 414, 948 P.2d 882 (1997).

¶38 We discussed "reasonable efforts" in *City of Tacoma v. Myhre*, 32 Wn. App. 661, 664, 648 P.2d 912 (1982), where police made insufficient efforts to put Myhre in contact with an attorney. The police gave Myhre access to a telephone to call his attorney, but when his attorney did not answer, the police refused Myhre's request to let him call his mother, who had the attorney's home number. 32 Wn.

App. at 662. We held that the police violated former JCrR 2.11(c)(2) (1973), which had language virtually identical to CrR 3.1(c)(2), because "[a]n additional call would not have burdened the police and obviously was necessary if defendant was to contact his attorney." 32 Wn. App. at 664. So too here, the additional step of dialing the home number of a public defender would not have burdened corrections staff and was obviously necessary for Pierce to contact an attorney.

¶39 In contrast, the police made reasonable efforts to put the defendant in contact with an attorney in *City of Seattle v. Wakenight*, 24 Wn. App. 48, 51, 599 P.2d 5 (1979). There, the police gave Wakenight, who was not indigent, a telephone book. 24 Wn. App. at 50. Wakenight made several calls but received no answer. 24 Wn. App. at 50. The police also contacted the office of the public defender for Wakenight. 24 Wn. App. at 49-50. Division One of our court held that such measures were sufficient to vindicate Wakenight's rights under CrR 3.1(c)(2), despite being unsuccessful. 24 Wn. App. at 51. But here, the police did not even take the minimal step of providing Pierce a phone book.

¶40 Similarly, in *City of Seattle v. Carpenito*, 32 Wn. App. 809, 813, 649 P.2d 861 (1982), the police gave Carpenito access to a telephone and a telephone book that listed the numbers of the public defender and private attorneys. 32 Wn. App. at 813. Both the private attorneys and the public defender's office had 24-hour answering services. 32 Wn. App. at 813. Division One held that this access was sufficient to comply with former JCrR 2.11(c)(2). 32 Wn. App. at 813. But distinguishably here, the public defender's office did not have a 24-hour answering service; corrections staff was required to dial the home numbers of public defenders after hours.

¶41 These cases demonstrate that merely giving the inmate access to a phone without providing the means to contact an attorney does not satisfy the CrR 3.1(c)(2)

requirement to provide "any other means necessary to place the person in communication with a lawyer." Although courts have accepted rather minimal efforts as reasonable, as in *Wakenight*, no court has accepted the procedure here: to put in jail a prisoner who has requested counsel and wait for him to reassert his right to counsel before taking steps to put him in contact with an attorney. The jail's own policy of dialing public defender *home* numbers after hours shows the futility of merely providing the public defender's *business* number after hours. Posting the business number cannot be deemed "reasonable efforts" under CrR 3.1(c)(2) under these facts.

¶42 Accordingly, the trial court's finding that the public defender's business number was posted near the booking phone does not support its conclusion that corrections staff took reasonable efforts to place Pierce in contact with an attorney. The trial court's conclusion on this point was erroneous.[5]

### C. *Not Harmless Error*

¶43 The State argues that assuming CrR 3.1(c)(2) was violated, any error was harmless. We disagree. Pierce's statements after the CrR 3.1(c)(2) violation provided strong evidence against him, and admitting those statements was not harmless.

¶44 The remedy for a violation of CrR 3.1 is "suppression of evidence tainted by the violation." *State v. Copeland*, 130 Wn.2d 244, 282, 922 P.2d 1304 (1996). But a violation of CrR 3.1 is harmless if there is no reasonable probability that the error materially affected the outcome of the trial. *State v. Templeton*, 148 Wn.2d 193, 220, 59 P.3d 632 (2002) (quoting *State v. Neal*, 144 Wn.2d 600, 611, 30 P.3d 1255 (2001)).

---

[5] The fact that Pierce reinitiated contact with the police does not impugn this conclusion. A defendant does not waive a CrR 3.1(c)(2) violation by reinitiating contact with the police unless the reinitiation occurs before the earliest opportunity to place the defendant in contact with an attorney. *Kirkpatrick*, 89 Wn. App. 407. The earliest opportunity to place Pierce in contact with an attorney was when he was booked into jail. His reinitiating contact with the police five hours later therefore does not cure this violation of CrR 3.1(c)(2).

¶45 Here Pierce's statements after the CrR 3.1(c)(2) violation showed that he had firsthand knowledge of nonpublic information about the killings, including the type of weapon used. The other evidence showed Pierce shoplifting a pellet pistol before the crime, showed him nearby on the highway before the crime, and showed him with the Yarrs' debit card after the crime. But Pierce's statements, especially as to the murder weapon, were the only evidence firmly establishing that he was at the Yarrs' house that night and their admission had a reasonable probability of materially affecting the verdict.[6] Accordingly, admitting these statements was not harmless and we reverse Pierce's convictions on this basis.

## II. PROSECUTORIAL MISCONDUCT

¶46 We next address Pierce's argument that prosecutorial misconduct denied him a fair trial. He argues that the prosecutor committed misconduct (1) by arguing facts not in evidence, (2) by appealing to the passion and prejudice of the jury, (3) by implying that the jurors' oaths required them to convict, and (4) by stating that the prosecutor represented the victims.[7] We agree that the prosecutor committed misconduct by arguing facts not in evidence and by appealing to the passion and prejudice of the jury. In addition, we address Pierce's other prosecutorial misconduct arguments that may recur on retrial.

---

[6] The State argues that if Pierce's statements had been excluded, it would have sought to admit other statements Pierce made to the jail superintendent after Pierce was sent to the hospital for a drug overdose. But these statements were not admitted at trial, and their hypothetical admission does not weigh on the question of whether the improperly admitted statements affected the verdict within a reasonable probability.

[7] Pierce also argues that the prosecutor improperly shifted the burden of proof to him during closing argument by asking the jury to "hold him to" his defense. Br. of Appellant at 50. But the State may comment on the lack of evidence to support the defendant's exculpatory theory. *See State v. Anderson*, 153 Wn. App. 417, 428, 220 P.3d 1273 (2009). Pierce presented the exculpatory theory that Pierce had helped the real shooter but was not the shooter himself. The State was entitled to comment on the lack of evidence to support that theory, and we discern no error on this point.

¶47 To establish prosecutorial misconduct, the defendant first bears the burden to establish that a prosecutor's conduct was improper. *State v. Emery*, 174 Wn.2d 741, 759, 278 P.3d 653 (2012). The defendant must then show that the improper comments resulted in prejudice that had a substantial likelihood of affecting the verdict. *Emery*, 174 Wn.2d at 760-61.

¶48 But when the defendant failed to object to the improper comments at trial, the defendant must also show that the comments were "so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *Emery*, 174 Wn.2d at 760-61. The focus of this inquiry is more on whether the resulting prejudice could have been cured, rather than the flagrant or ill-intentioned nature of the remarks. *Emery*, 174 Wn.2d at 762. Arguments that have an " 'inflammatory effect' " on the jury are generally not curable by a jury instruction. *Emery*, 174 Wn.2d at 763 (providing examples of cases where prosecutors appealed to jury emotions and prejudices in egregious fashion) (quoting *State v. Perry*, 24 Wn.2d 764, 770, 167 P.2d 173 (1946)).

¶49 We review a prosecutor's purportedly improper remarks in the context of the entire argument, the issues in the case, the evidence addressed in the argument, and the instructions to the jury. *State v. Gregory*, 158 Wn.2d 759, 810, 147 P.3d 1201 (2006). Where defense counsel objected to a prosecutor's remarks at trial, we review the trial court's rulings for abuse of discretion. *Gregory*, 158 Wn.2d at 809.

A. *Appeals to Passion and Prejudice and Arguments Outside the Record*

¶50 "Mere appeals to the jury's passion or prejudice are improper." *Gregory*, 158 Wn.2d at 808 (citing *State v. Belgarde*, 110 Wn.2d 504, 507-08, 755 P.2d 174 (1988)). But " '[a] prosecutor is not muted because the acts committed arouse natural indignation.' " *State v. Borboa*, 157 Wn.2d 108, 123, 135 P.3d 469 (2006) (quoting *State v. Fleetwood*, 75

Wn.2d 80, 84, 448 P.2d 502 (1968)). A prosecutor is not barred from referring to the heinous nature of a crime but nevertheless retains the duty to ensure a verdict "free of prejudice and based on reason." *State v. Claflin*, 38 Wn. App. 847, 849-50, 690 P.2d 1186 (1984).

¶51 Moreover, the State has wide latitude to argue inferences from the evidence. *Gregory*, 158 Wn.2d at 841. But a prosecutor commits reversible misconduct by urging the jury to decide a case based on evidence outside the record. *See Claflin*, 38 Wn. App. at 850-51. This rule is closely related to the rule against pure appeals to passion and prejudice because appeals to the jury's passion and prejudice are often based on matters outside the record. *See Belgarde*, 110 Wn.2d at 507-10 (prosecutor appealed to jury's passion and prejudice by addressing defendant's ties to group that prosecutor characterized as terroristic based on facts outside the evidence); *Claflin*, 38 Wn. App. at 850-51 (prosecutor in rape trial read poem to jury that appealed to jury's passion and prejudice and referred to matters outside the evidence).

¶52 Pierce assigns error to three examples of the prosecutor appealing to the jury's passion and prejudice and arguing facts outside the evidence: (1) the prosecutor's first person narrative of the thoughts Pierce must have been thinking leading up to the crimes, (2) the prosecutor's fabricated description of the murders, and (3) the prosecutor's argument that the Yarrs could not have imagined they would be murdered in their own home. Because Pierce objected to the first two arguments, he need show only that they were improper and were reasonably likely to have affected the verdict. Because Pierce did not object to the third argument, he must additionally show that it caused prejudice incurable by a jury instruction. We hold that Pierce has met his burden as to all three arguments and reverse his convictions on this basis, in addition to the CrR 3.1(c)(2) violation.

¶53 We first address the prosecutor's argument as to Pierce's thought process before the crimes. This argu-

ment was an improper appeal to the passion and prejudice of the jury based on facts outside the evidence.[8] By arguing in the first person singular, the prosecutor inflamed the prejudice of the jury against Pierce by attributing repugnant and amoral thoughts to him—thoughts that were based on the prosecutor's speculation and not the evidence.

¶54 The Court of Appeals for the District of Columbia came to a similar conclusion in *Hawthorne v. United States*, 476 A.2d 164 (D.C. 1984). There, the prosecutor delivered his closing argument in the first person, attributing a litany of fabricated statements to the alleged murder victim. 476 A.2d at 170. The court held, "The first person singular rhetorical device had the dual effect of placing the prosecutor in the victim's shoes and turning the prosecutor into [the victim's] personal representative." 476 A.2d at 172. Such argument gave the prosecutor's opinion about the victim's thoughts before his death, which were not in evidence. 476 A.2d at 171. Moreover, the argument was an improper inflammatory appeal to the jury. 476 A.2d at 172. The court reversed on this basis. 476 A.2d at 173.

¶55 By analogy here, if it is improper for the prosecutor to step into the victim's shoes and become his representative, it is *far more improper* for the prosecutor to step into the *defendant's* shoes during rebuttal and, in effect, become the *defendant's* representative. The prosecutor's statements attributed to Pierce were calculated to portray Pierce as an impatient, amoral drug addict who refused to work and "want[ed] [his] meth now," as the prosecutor repeatedly put it. Such argument served no purpose but to inflame the jury's prejudice against Pierce.

¶56 Furthermore, the prosecutor could have properly argued that the jury should infer from the evidence that Pierce was impatient for methamphetamine and thus de-

---

[8] Pierce argues that the prosecutor impermissibly commented on Pierce's right to remain silent by "inventing prejudicial and incriminating statements and attributing them to him." Br. of Appellant at 68. But Pierce cites no authority for this constitutional argument and we do not consider it.

cided to rob the Yarrs. But the prosecutor went beyond his wide latitude in drawing inferences from the evidence by effectively testifying about what particular thoughts Pierce must have had in his head: a matter, as in *Hawthorne*, that was outside the evidence.

¶57 We next address the prosecutor's fabricated and inflammatory account of the Yarrs' murders. The evidence supported some of the prosecutor's argument on this point. The jury could have inferred from the evidence that the Yarrs gave Pierce their debit card and PIN and that he forced them to lie down next to each other on the floor before shooting them in the backs of their heads. But there was no evidence from which the jury could have inferred that Pat Yarr pleaded for mercy for himself and his wife, that Pat Yarr threatened Pierce, that the Yarrs looked into each others' eyes, or that Pierce told them to say their "goodbyes" before killing them. These emotionally charged embellishments to the evidence were nothing more than an improper appeal to the jury's sympathy that encouraged the jury to decide the case based on the prosecutor's heart-wrenching, though essentially fabricated, tale of how the murders occurred.

¶58 We finally address the prosecutor's argument that "[n]ever in their wildest dreams . . . or in their wildest nightmare" would the Yarrs have expected to be murdered on the day of the crime. 8 RP (Trial) at 1086-87. This argument was an improper appeal to passion and prejudice. It served no purpose but to appeal to the jury's sympathy. That the Yarrs would never have expected the crime to occur was not relevant to Pierce's guilt, nor were the prosecutor's assertions about the Yarrs' future plans. Moreover, the argument invited the jury to imagine themselves in the Yarrs' shoes, increasing the prejudice.[9]

---

[9] Pierce argues that this argument was an improper "golden rule" argument because it asked the jury to imagine themselves in the victims' shoes. Br. of Appellant at 55. But in *Borboa*, 157 Wn.2d at 124 n.5, our Supreme Court held, "[W]e are not convinced that the prohibition on 'golden rule' arguments applies in

¶59 Because Pierce failed to object to this argument, however, he must show that it caused prejudice incurable by a jury instruction. In the context of the entire argument and the evidence in this case, we hold that he has done so. Because the prosecutor focused on how shocking and unexpected the crimes were and invited the jury to imagine themselves in the position of being murdered in their own homes, in conjunction with the prosecutor's other improper and highly inflammatory arguments this argument engendered an incurable prejudice in the minds of the jury.

¶60 Taken together, there is more than a substantial likelihood that the above three improper arguments affected the verdict. The prosecutor argued outside the evidence about what Pierce's thoughts were before the crime, invited the jury to relive the horror of the murders by fabricating a heart-wrenching story about how the murders occurred, and invited the jury to imagine the crimes happening to themselves. In light of the trial court's failure to sustain Pierce's objections, coupled with the prosecutor's repeated improper comments, we are compelled to conclude that the prosecutor's improper comments had a substantial likelihood of affecting the verdict.

¶61 Pierce has consequently met his burden to show reversible misconduct. As such, in addition to the CrR 3.1(c)(2) violation, we reverse Pierce's convictions based on the prosecutor's appeals to the jury's passion and prejudice and arguments outside the evidence.

B. *Statements Regarding Jurors' Oath and Stating Prosecutor Represents Victims*

¶62 We next address Pierce's arguments that the prosecutor's statements regarding the jurors' oath and statements that the prosecutor represented the victims

the criminal context." Instead, the court held that arguments inviting the jury to imagine themselves in the victim's place are more properly addressed under the rubric of appeals to the jury's sympathy or passion. 157 Wn.2d at 124 n.5. We are compelled to follow *Borboa*, and we thus analyze the prosecutor's statements as appeals to the jury's passion and prejudice.

were misconduct. Pierce did not object to any of these arguments below. We hold that while these arguments were improper, the prejudice they caused would have been curable by a jury instruction and thus they do not constitute reversible misconduct. However, we caution that these arguments should not be repeated on retrial.

¶63 With regard to the jurors' oath, the prosecutor argued:

> As I said in *voir dire*, it's a hard job, you've done it, you've got my respect, you've got my gratitude, and I asked during *voir dire*, you know, "Are you up to the task?" . . . And you took an oath. And we talked about that oath, much like the oaths that you took to, you know, protect your country, you know, to—you know, the oath that you took when you passed the Bar and went to law school . . . you know, the marriage oath, it was pretty important to one person. Not to overthrow the government of the United States and, you know, not to divulge company secrets, you know, so you've got that oath. Take that oath seriously and apply the facts to the law and find Mr. Pierce guilty of every single count and every single issue. So you're going to get that and, you know, you're going to have to go through it and kind of figure it out.
>
> It sounds complicated, but if you take your time, especially on the murder counts, you can find him guilty of both premeditated and . . . felony murder.

8 RP (Trial) at 1147-48. The prosecutor's analogy between the jurors' oath and an oath of marriage or an oath not to overthrow the government was improper. In making this analogy, the prosecutor implied that violating the jurors' oath was akin to adultery or treason. The unstated conclusion to draw from this argument is that voting to acquit Pierce was akin to adultery or treason. We cannot condone such implications from a public prosecutor.

¶64 Also, during both opening and closing statements at trial the prosecutor stated that he brought this case on behalf of the victims. The most egregious of these statements were those during closing argument rebuttal, where

the prosecutor stated that he brought the case "[o]n behalf of . . . the elected Prosecuting Attorney of Jefferson County, and [the Jefferson County Sherriff], whose agency handled this investigation, [the Yarrs' daughters], the friends and family of, of the Yarrs, and certainly, last but not least, Pat and Janice Yarr . . . ." 8 RP (Trial) at 1085.

¶65 These statements were likewise improper. A prosecutor does not represent the victims in a criminal trial. According to comment 1 of Rule of Professional Conduct (RPC) 3.8, "A prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence." Thus, by stating that he represented law enforcement, the family and friends of the victims, and the victims themselves, the prosecutor misrepresented to the jury that he was an advocate for law enforcement and the victims and he misstated his duties under RPC 3.8. *See also State v. Monday*, 171 Wn.2d 667, 676, 257 P.3d 551 (2011) (prosecutor is quasi-judicial officer who represents public as well as defendant); *State v. Gentry*, 125 Wn.2d 570, 680, 888 P.2d 1105 (1995) (Johnson, J., dissenting) ("A criminal proceeding is not a private right of action for the victim's benefit.").

¶66 Although both of the arguments analyzed above were improper, they were both curable by jury instructions. These arguments were not inflammatory appeals to the jury's emotions or prejudices but, rather, misstatements about the jury's duty and the prosecutor's role. To the extent the arguments may have confused the jury on those issues, any confusion could have been cured by an objection from Pierce and a proper instruction from the trial court. *See Emery*, 174 Wn.2d at 763 (comments that risked jury confusion regarding role of jury and burden of proof were curable). Pierce has accordingly failed to show reversible error as to these arguments. But we note that these arguments were improper and we caution that they should not be repeated on retrial.

### III. Motion To Disqualify Counsel

¶67 Finally, Pierce argues that the trial court erred by denying his pretrial motion to disqualify defense counsel. Although we reverse based on the CrR 3.1 violation and prosecutorial misconduct, we address this issue because it will likely recur on remand. We hold that the trial court did not err in denying the motion to disqualify counsel.

¶68 Whether a conflict of interest precludes continued representation of a client is a question of law we review de novo. *State v. Vicuna*, 119 Wn. App. 26, 30, 79 P.3d 1 (2003) (quoting *State v. Ramos*, 83 Wn. App. 622, 629, 922 P.2d 193 (1996)). Prior representation of a witness does not automatically disqualify counsel from representing the defendant in a case where the witness will testify. *Vicuna*, 119 Wn. App. at 32.

¶69 RPC 1.9(a) states, "A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing." And under RPC 1.9(b), a conflict under RPC 1.9(a) is imputed to all lawyers in a firm or, in this case, a public defender's office. *State v. Hunsaker*, 74 Wn. App. 38, 42, 873 P.2d 540 (1994).

¶70 Here, JAC had represented Boyd on 28 different matters. The trial court found, however, that the instant matter was not the same as or substantially related to the prior matters. The trial court was correct on this point.

¶71 Pierce claims that JAC nevertheless had a conflict of interest because it possessed confidential information about Boyd's involvement with drugs or alcohol that it should have used to impeach Boyd. *See generally* RPC 1.6(a). At trial, Boyd testified both that he almost never drank beer and that he did not "mess with" methampheta-

mine. 6 RP (Trial) at 696. But there is no suggestion in the record that JAC had any confidential information about Boyd's history with drugs or alcohol that would have impeached this testimony. Because nothing in the record supports Pierce's argument on this point, the trial court did not err in denying Pierce's motion to disqualify JAC.

¶72 We reverse and remand for a new trial.

VAN DEREN and JOHANSON, JJ., concur.

Review denied at 175 Wn.2d 1025 (2012).