2015 APR 27 AM 9: 52


IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 71096-6-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| JASON CASTILLO ROMERO, | ) | |
| | ) | |
| Appellant. | ) | FILED: April 27, 2015 |

SCHINDLER, J. — Jason Castillo Romero appeals the jury convictions of burglary in the second degree and bail jumping. Romero contends prosecutorial misconduct during closing argument deprived him of a fair trial. In the alternative, Romero argues his attorney provided ineffective assistance of counsel by failing to object. Because Romero cannot show the remarks could not have been addressed by a curative instruction or the result of the trial would have been different, we affirm.

FACTS

On Tuesday, January 10, 2012, Uzias Gutierrez-Hougardy went with his mother Misty[1] to drop off food at the Living Hope Church of Nazarene. Living Hope is a small church with a congregation of between 45 and 60 members. The church is a two-story building with several classrooms, a full kitchen, a large gathering area, and multiple

---

[1] We refer to several witnesses by their first names for clarity. No disrespect is intended.

restrooms. The church was locked. Uzias used a key code to enter through a side door. As Uzias was walking down the hallway to go downstairs to open the kitchen door for his mother, he saw a man he did not recognize coming out of a restroom. The man, later identified as Jason Castillo Romero, "kind of stopped" and Uzias said, "[H]i." Romero "said hi back" and Uzias continued to walk down the hallway. Uzias told his mother Misty about seeing the man. Misty said no one was supposed to be in the building.

Uzias and church members Fred Schwyhart and his spouse Sylvia returned to the church that same day to look for Romero. They did not find Romero. As they walked through the church, they noticed a number of items were out of place or missing. There was an empty juice bottle and glass "sitting on the top of the stairs against the wall." In one of the classrooms, "[t]he chairs had been all stacked up blocking the windows" and the "writer/reader board was up against another door that had a small window so it . . . blocked looking out that little window." There was a "blue storage container box" with "a fire extinguisher, candles, [and] mission books from the foyer" inside. Fred noticed fire extinguishers "were missing" from other parts of the church. There were also several items in the classroom that were normally in the pastor's locked office, including an autographed baseball in a display box, printer ink, and a prescription pill bottle belonging to the pastor's secretary. Someone had written "forgive those who trespass" on the classroom whiteboard. Fred did not recognize the handwriting and knew the writing had not been there on Sunday. In the kitchen, the oven light was on, there was a pot on the stove, and there was a "noodle bowl" in the oven with "the fork . . . still in there." Food was missing from the refrigerator. The

2

pastor's office door "had been broken into," and there was water on the floor of the shower in the pastor's private bathroom as though someone had recently used it.

Fred called 911. Normandy Park Police Department Officer David Unger searched the church but did not find anyone. Officer Unger did not see any evidence of forced entry but noticed "some damage to the walls" in the classroom where the chairs had been moved.

The next day, Misty found "a mess in the kitchen. Somebody had made oatmeal and didn't clean up." Pastor Patrick Lyon noticed the camcorder from the computer in his office was missing. Pastor Lyon went into the sound booth to check if other items were missing and saw an electrical cord hanging from a crawl space in the ceiling.

Maintenance custodian Edward Towle and another church member got a ladder and started to climb up to the crawl space to investigate. Suddenly, a male voice said, "I'm coming down . . . . Please don't hurt me." Romero emerged from the crawl space and "laid out on the ground." Romero was "cooperative and calm."

Romero remained on the ground until police arrived and arrested him a few minutes later. Romero told Normandy Park Police Department Detective Daniel Will that he was "scared" and that he had "been in there since Monday." Romero said he entered the church through an unlocked window. Normandy Park Police Department Officer David Bond found several items in the crawl space, including blankets, a radio, a coffee pot, used plates and cups, food items, several used candles, and a backpack. "[R]ight inside the opening" to the crawl space was a "three-pronged gardening tool" as well as "a couple of large kitchen knives" that were "wedged between . . . pieces of plywood." Romero identified the backpack as his but said some of the items in the

backpack "may be the church's." The backpack contained a "WebCam," a computer keyboard, computer speakers, and a set of keys labeled "shed." Pastor Lyon identified the contents of the backpack as belonging to the church.

The State charged Romero with burglary in the second degree. The information alleged Romero committed the crime of burglary "while the victim of the burglary was present in the building or residence." After Romero failed to appear at his omnibus hearing, the State amended the information to add a bail jumping charge.

A number of witnesses testified during the four-day jury trial, including Uzias, Misty, Fred and Sylvia, Officer Unger, Pastor Lyon, Towle, Detective Will, and Officer Bond. The defense did not call any witnesses. At the request of the defense, the court instructed the jury on the lesser included crime of trespass.

In closing, defense counsel argued that Romero was guilty of only the lesser included crime of criminal trespass because Romero did not enter the building with the intent to commit a crime. Defense counsel argued the evidence showed Romero was "squatting" inside the building and that if he was actually there to commit a crime, he would have "taken off" when he was discovered in the crawl space rather than lie on the floor and wait for the police to arrive.

The jury found Romero guilty of burglary in the second degree and bail jumping. The jury also found Romero committed the burglary while the victim of the burglary was present in the building or residence. The court imposed concurrent standard range sentences of 55 months for burglary and 43 months for bail jumping.

ANALYSIS

Romero seeks reversal of the convictions on the grounds that prosecutorial misconduct during closing argument deprived him of the right to a fair trial. Romero argues the prosecutor improperly urged the jury to decide the case based on passion and prejudice and misstated the law. In the alternative, Romero argues his attorney provided ineffective assistance of counsel by failing to object.

Prosecutorial Misconduct

Prosecutorial misconduct may deprive a defendant of his right to a fair trial. State v. Davenport, 100 Wn.2d 757, 762, 675 P.2d 1213 (1984). To prevail on a claim of prosecutorial misconduct, a defendant must establish that the conduct was both improper and prejudicial. State v. Fisher, 165 Wn.2d 727, 747, 202 P.3d 937 (2009).

Prosecutorial misconduct is prejudicial where there is a substantial likelihood the improper conduct affected the jury's verdict. State v. Yates, 161 Wn.2d 714, 774, 168 P.3d 359 (2007). But where, as here, defense counsel fails to object, any error is waived unless the conduct was so "flagrant and ill-intentioned that it evinces an enduring and resulting prejudice that could not have been neutralized by admonition to the jury." State v. Stenson, 132 Wn.2d 668, 719, 940 P.2d 1239 (1997).

> Proper and timely objections provide the trial court an opportunity to correct the misconduct and caution jurors to disregard it. It prevents abuse of the appellate process and saves the substantial time and expense of a new trial.

State v. Walker, ___ Wn.2d ___, 341 P.3d 976, 984 (2015) (citing State v. Emery, 174 Wn.2d 741, 761-62, 278 P.3d 653 (2012)). In determining whether there was prejudice that could have been neutralized by an admonition to the jury, we focus less on whether

5

the misconduct was flagrant or ill-intentioned and more on whether any misconduct could have been obviated by a curative instruction. Emery, 174 Wn.2d at 762.

The defendant bears the burden of establishing remarks made during closing argument were improper as well as their prejudicial effect. State v. Russell, 125 Wn.2d 24, 85, 882 P.2d 747 (1994). Even if they are improper, the remarks by the prosecutor are not grounds for reversal "if they were invited or provoked by defense counsel and are in reply to his or her acts and statements, unless the remarks are not a pertinent reply or are so prejudicial that a curative instruction would be ineffective." Russell, 125 Wn.2d at 86. We review the allegedly improper comments in the context of the entire closing argument, the issues presented, the evidence addressed, and the instructions given to the jury. Russell, 125 Wn.2d at 85-86.

Romero contends the argument that he collected items such as the butcher knives and a garden trowel, "in case somebody infringed on his newly found space," improperly appealed to the passion and prejudice of the jury. A prosecutor may not make comments designed to appeal to the passion and prejudice of the jury or encourage a verdict based on emotion rather than evidence. In re Pers. Restraint of Glasmann, 175 Wn.2d 696, 704, 286 P.3d 673 (2012). However, the prosecutor has wide latitude to argue reasonable inferences from the evidence. Glasmann, 175 Wn.2d at 704; Fisher, 165 Wn.2d at 747.

In closing argument, the prosecutor argued that there was "a lot of evidence of the defendant's intent to commit a crime inside the church." In addition to Romero's efforts to "conceal his presence inside the church," the prosecutor argued that the evidence showed Romero stole food from the church and used the pastor's private

shower. The "biggest piece of evidence of the defendant's true intent," the prosecutor

argued, was that he kicked in the pastor's locked office door and took a number of

valuable electronics and office supplies.

> [I]nside the black backpack were numerous articles. I believe that [Pastor Lyon] testified that there was a WebCam, there were speakers, there was a keyboard, there were keys for the shed out back, and there were other miscellaneous office supplies.
>
> . . . .
>
> What in the world is the defendant doing with these things? If the defendant is just there trespassing, he just is cold and tired and needs a place to sleep, what in the world is he going to do with computer speakers? With a WebCam?
> You can't eat it. It won't keep you warm. They are things of value that he wanted and he has committed a theft by taking those things up into his space and withholding them from the true owner.

The prosecutor also argued the butcher knives and the garden trowel found in

the crawl space showed Romero's intent to commit a crime inside the church. The

prosecutor argued Romero collected these items "in case somebody infringed on his

newly found space."

> The last piece of evidence that I think is somewhat significant is the . . . fact that the defendant had started to collect tools and instruments that could potentially be used as weapons, and he stored these up in the crawlspace.
> Now who knows what the defendant was hoarding, you know, four butcher knives for, or that — there is a picture that you will see of this three-pronged — it is like a mini pitchfork for your garden — you hoe the dirt with.
> Who knows what the defendant was doing with those things?
> There was testimony that that garden pitchfork had been out in the shed previously. He had the shed keys in his backpack so we know where he got it and that the butcher knives were kept in a butcher block down in the kitchen.
> We do know that they were close at hand up in his hidy-hole; that someone would come that he didn't feel should have been there.
> Is it reasonable to think that the defendant was going to do some gardening or needed four butcher knives up there for some, you know, legitimate reason?

7

It is reasonable to conclude that the defendant gathered those items in case somebody infringed on his newly found space.

And again, it is just another piece of evidence of intent to commit a crime therein.

The prosecutor's remarks were not improper. The arguments were based on reasonable inferences from the evidence. Further, the remarks were not so flagrant and ill-intentioned that they could not have been cured with an instruction.

State v. Pierce, 169 Wn. App. 533, 280 P.3d 1158 (2012), is distinguishable. In Pierce, the prosecutor fabricated an entire conversation between the defendant and the victims just before he murdered them. Pierce, 169 Wn. App. at 555. The prosecutor also created a fictitious internal dialogue of what the defendant may have been thinking before and during the murders and recited it in the first person narrative during closing. Pierce, 169 Wn. App. at 553-54. Finally, the prosecutor stated, without objection, that " '[n]ever in their wildest dreams . . . or in their wildest nightmare' " would the victims have expected to be murdered on the day of the crime. Pierce, 169 Wn. App. at 555.[2] The court held the first two arguments were improper because they were based on the prosecutor's speculation and not on the evidence, and they were an appeal to the jury's sympathy. Pierce, 169 Wn. App. at 553-55. Although the defendant did not object to the third argument, the court concluded it was also an improper appeal to passion and prejudice that invited the jury to imagine themselves in the victims' shoes and could not be cured by a jury instruction. Pierce, 169 Wn. App. at 556.

Here, unlike in Pierce, the arguments were based on reasonable inferences from the evidence. Further, the defense used the prosecutor's argument to point out how cooperative Romero was and to argue Romero's actions did not show he intended to

---

[2] Alterations in original.

commit a crime. The incorporation of this argument into the defense argument weakens the contention that it denied Romero a fair trial. See Russell, 125 Wn.2d at 89. During closing argument, the defense attorney argued, in pertinent part:

> Now the State has made much ado about garden implements, knives and these sorts of things, and what was [Romero] going to do with that sort of stuff?
> Again, Jason's inaction speaks volumes.
> On the day he comes down from the ceiling, "Please don't hurt me, I'm coming down."
> He comes down the ladder, undirected, lays down on the floor in the foyer.
> Now here we have a person that [the prosecutor] wants you to believe is there to commit a crime and he, Jason, comes down out of the ceiling and lays down on the floor in the foyer with the front door right there.
> He could have split. He could've run. He could've taken off.

Romero also contends the prosecutor misstated the law when she encouraged the jury to reject the lesser charge of criminal trespass because a trespass "is temporary." The State concedes the prosecutor misstated the law but argues a curative instruction could have corrected any prejudice.

While it is improper for a prosecutor to misstate the law, reversal is required only if the misconduct had a substantial likelihood of affecting the verdict. State v. Warren, 165 Wn.2d 17, 28, 195 P.3d 940 (2008).

In closing argument, the prosecutor stated the central dispute in the case was whether Romero unlawfully entered or remained in the church with the intent to commit a crime. The prosecutor argued that "the difference between a criminal trespass and a burglary — is whether that entering or remaining unlawfully was done with intent to commit a crime therein." The prosecutor then argued that this was not "just a trespass"

9

because "[a] trespass is temporary."

> Now the defense attorney would like you to believe that this was just a trespass; that the defendant was just trespassing. He didn't intend to commit any crimes inside the church.
> But this isn't a trespass. A trespass is temporary. A trespass is cutting through your neighbor's yard to get to the bus stop quicker. A trespass does not involve remaining unlawfully with the intent to commit crimes or actually committing crimes.
> So a trespass versus a burglary, this about what we have here. This is a long-term situation. It is not temporary. It is not like the defendant — it is not like church members come in the first morning and find the defendant huddled with a blanket on a queue [sic].
> That is a trespass. That is "it is cold outside. I need to get in and stay warm. I didn't mean anyone any harm. I needed a place to sleep."
> That is not what happened here.

In State v. Reed, 168 Wn. App. 553, 278 P.3d 203 (2012), the prosecutor stated that the presumption of innocence "does last all the way until you walk into that [jury] room and start deliberating." Reed, 168 Wn. App. at 578.[3] We concluded the remark was an incorrect statement of the law but "a simple instruction from the trial court indicating that the presumption of innocence may be overcome, if at all, only during the jury's deliberations would have been sufficient to overcome any prejudice resulting from the prosecutor's remark." Reed, 168 Wn. App. at 578-79.[4]

Similarly, here, a curative instruction would have neutralized any prejudice resulting from the prosecutor's misstatements that a trespass is "temporary." The prosecutor correctly stated that the difference between a trespass and a burglary is that a trespass "does not involve remaining unlawfully with the intent to commit crimes or actually committing crimes," and argued throughout her closing that Romero was guilty of burglary because he entered or remained in the church with the intent to commit a crime. The court correctly instructed the jury that "[a] person commits the crime of

---

[3] Internal quotation marks omitted, alteration in original.

[4] Emphasis in original.

criminal trespass in the first degree when he knowingly enters or remains unlawfully in a building." The court also instructed the jury to "disregard any remark, statement, or argument that is not supported by the evidence or the law in my instructions." We presume the jury followed the court's instructions. State v. Dye, 178 Wn.2d 541, 556, 309 P.3d 1192 (2013).

Ineffective Assistance of Counsel

In the alternative, Romero contends that his attorney provided ineffective assistance of counsel by failing to object to the prosecutor's remarks during closing argument. To establish ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the performance prejudiced the defendant's case. Strickland v. Washington, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Deficient performance is shown if counsel's conduct fell below an objective standard of reasonableness. Stenson, 132 Wn.2d at 705-06. To satisfy the prejudice prong, a defendant must show a "reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different." State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995).

There is a strong presumption that counsel provided effective assistance. State v. Tilton, 149 Wn.2d 775, 784, 72 P.3d 735 (2003). To rebut this presumption, a defendant bears the burden of establishing the absence of any " 'conceivable legitimate tactic explaining counsel's performance.' " State v. Grier, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011) (quoting State v. Reichenbach, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)).

Here, Romero has not shown that defense counsel did not have any conceivable legitimate reason not to object or that if his attorney had objected to the remarks during closing argument, the result of the trial would have been different.

We affirm Romero's convictions for burglary in the second degree and bail jumping.

WE CONCUR: