IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 79147-8-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| ALPERT, WAYNE HYMAN, | ) | |
| DOB: 07/03/1957, | ) | |
| | ) | |
| Appellant. | ) | |

BOWMAN, J. — A jury convicted Wayne Hyman Alpert of second degree assault with a deadly weapon and second degree murder while armed with a firearm, stemming from two separate incidents. Alpert claimed self-defense to both counts. Alpert argues that the trial court erred by refusing to instruct the jury that he had no duty to retreat and admitting statements that violated his CrR 3.1 right to counsel. He also assigns error to certain evidentiary rulings and claims ineffective assistance of counsel. We affirm Alpert's second degree assault conviction. But we conclude that the trial court erred in refusing to instruct the jury that Alpert had no duty to retreat from the confrontation leading to his conviction for murder in the second degree and admitting statements tainted by violation of his CrR 3.1 right to counsel. We reverse and remand for retrial on the second degree murder charge subject to suppression of the evidence obtained in violation of Alpert's right to counsel.

Citations and pin cites are based on the Westlaw online version of the cited material.

FACTS

On June 11, 2017, Alpert planned to ride the bus to visit his three-year-old grandson, who lived in an apartment in Marysville with his mother, Ashley Moffett. He was supposed to meet them at 3:00 p.m. After missing two buses, Alpert felt tired and frustrated that he would be very late for the visit, and he did not have a cell phone with him to call Moffett. It was close to 3:00 p.m. when Alpert finally got on a bus. Alpert asked the driver for help finding his destination. The driver refused to answer while he was driving. Alpert swore as he walked to his seat at the very back of the bus. Another passenger, Jeremy Gredvig, asked Alpert to "calm down" as Alpert passed him. A few minutes later, Alpert walked back to where Gredvig was sitting and apologized to him for his outburst. Gredvig "thought everything was . . . cool."

Alpert and Gredvig got off the bus at the same stop. Gredvig planned to walk to a nearby park to visit with his daughters, but Alpert approached him and provoked an argument. The two men started yelling and swearing at each other. They were about eight feet apart when Alpert pulled out a gun and pointed it at Gredvig's face. Alpert cocked the gun and a bullet ejected from the chamber. Gredvig then walked directly at Alpert, who kept the gun pointed at Gredvig's face but backed away until he "ran backwards into" a nearby light pole. Gredvig warned Alpert that he was going to call the police. As Gredvig reached into his pocket to get his cell phone, Alpert put away his gun and walked away. Gredvig called 911.

2

Alpert walked to Moffett's apartment building but was over two hours late for the visit with his grandson. Moffett's first-floor apartment was one of seven units in the building. Alpert knocked on the door of Moffett's apartment but nobody answered. He walked around to the back of the apartment to see if anyone was sitting outside on the patio. The patio was empty and no one answered when he knocked on the sliding glass door. Alpert decided to leave his belongings at the back patio and cool off near the side of the building in the shade. Worried his family would not notice him when they returned, he went to leave his hat on the front stoop.

Seaton Jeffry Baker lived in an upper floor apartment near Moffett. Baker was drinking and grilling on his second-floor balcony with his friend and neighbor Forrest Dalton. They saw Alpert walking around Moffett's apartment and pacing "back and forth" in the parking lot. Baker did not recognize Alpert and thought he was a "transient." Baker yelled at Alpert to " 'get the fuck out of here.' " Dalton told Baker to calm down and Alpert explained to Baker that he knew Moffett and was there to visit his grandson. Alpert did not immediately leave. Baker told Dalton, " 'This is bullshit. I ain't putting up with it.' " Baker went downstairs to confront Alpert.

Alpert saw Baker was "upset" and "not happy" so he decided to leave. Alpert walked back around Moffett's apartment to the patio and picked up his belongings. He then returned to the front of the building and saw Baker coming toward him "pretty quickly." Alpert began backing away. Baker was "livid," yelling and cursing at Alpert. Walking backward, Alpert went back around the

3

corner of the apartment building toward the patio. According to Alpert, Baker said, " 'I'm going to snap your neck like a twig.' " Alpert told Baker to " '[s]top' " and call 911 while he continued to back away. Baker did not stop.

After turning the corner of the building, Alpert stopped, faced Baker, and repeated, " 'Stop, call 911.' " Again, Baker did not stop. Alpert then took out his gun, pointed it at Baker, and pulled the slide to eject a cartridge as a "warning." Baker continued to advance, "like he was going to tackle" Alpert. Alpert shot Baker at least eight times from about an arm's length away in the abdomen, chest, and head. He "just kept shooting until [he] couldn't shoot" anymore. After Baker fell to the ground, Alpert went over to see if he could give medical help, but Baker appeared to be "fatally wounded." Alpert then retrieved his belongings, walked out of the apartment complex, and sat on a curb to wait for the police. Baker died at the scene.

The State charged Alpert with one count of second degree murder of Baker and one count of second degree assault of Gredvig with firearm enhancements. Alpert claimed that he acted in self-defense in both instances. The court held a CrR 3.5 hearing to determine whether it should suppress Alpert's statements he made to officers after his arrest. Alpert argued that his statements were inadmissible under CrR 3.1 and the Fifth Amendment to the United States Constitution. The court denied Alpert's motion and entered findings of fact and conclusions of law.

At trial, Alpert asked the court to instruct the jury that he had no duty to retreat from his encounters with Gredvig and Baker. The State objected to the

4

instruction and requested a first aggressor instruction, arguing Alpert "is not entitled to a no duty to retreat instruction where there is no evidence that anyone other than the defendant was the original aggressor." Alpert opposed giving a first aggressor instruction. The court denied both Alpert's request for a no duty to retreat instruction and the State's request for a first aggressor instruction.

A jury found Alpert guilty as charged. By special verdict, the jury found Alpert was armed with a firearm at the time of the commission of the crimes. The trial court imposed concurrent sentences at the low end of the standard sentencing range with consecutive firearm enhancements. Alpert appeals.

ANALYSIS

I. No Duty To Retreat Instruction

Alpert contends the trial court's refusal to give a "no duty to retreat" instruction prevented him from meaningfully presenting his self-defense claim. We review the adequacy of jury instructions de novo as a question of law. State v. Clausing, 147 Wn.2d 620, 626-27, 56 P.3d 550 (2002).

Jury instructions are sufficient when they allow each party to argue its theory of the case, are not misleading, and properly instruct the jury on the applicable law. State v. Sibert, 168 Wn.2d 306, 315, 230 P.3d 142 (2010). A defendant is entitled to an instruction on self-defense if there is "some evidence" demonstrating self-defense. State v. Walden, 131 Wn.2d 469, 473, 932 P.2d 1237 (1997); State v. Fisher, 185 Wn.2d 836, 848-49, 374 P.3d 1185 (2016). In considering whether sufficient evidence supports a jury instruction, we view the evidence in the light most favorable to the proponent of the instruction. Fisher,

185 Wn.2d at 849. "Jury instructions on self-defense must more than adequately convey the law. Read as a whole, the jury instructions must make the relevant legal standard manifestly apparent to the average juror." Walden, 131 Wn.2d at 473.[1] A jury instruction misstating the law of self-defense amounts to an error of constitutional magnitude that we presume is prejudicial. Walden, 131 Wn.2d at 473.

"[P]ersons acting in self-defense have no duty to retreat when assaulted in a place they have a right to be." State v. Redmond, 150 Wn.2d 489, 490, 78 P.3d 1001 (2003). A no duty to retreat instruction is necessary where a jury may objectively conclude that flight was a reasonable alternative to the use of force. Redmond, 150 Wn.2d at 495. The court should give the instruction "when sufficient evidence is presented to support it." Redmond, 150 Wn.2d at 493. Failure to provide a no duty to retreat instruction, where supported by some evidence, is reversible error. Redmond, 150 Wn.2d at 495.

A. Second Degree Murder

Alpert argues that he was entitled to a no duty to retreat instruction in support of his claim of self-defense to the second degree murder charge. We agree.

Whether retreat was a reasonable alternative to Alpert shooting Baker was a central issue at trial. Testimony established that Baker confronted Alpert in front of Moffett's apartment. Alpert walked away from Baker and around the corner of the apartment to the back of the building. Witnesses described the

---

[1] Internal citations omitted.

back of the building as a large grassy area bordered by a fence and hedges, with an opening to the west and access to a long pathway that winds around the apartment complex.

Dalton testified that Baker followed Alpert "about 20 paces behind him." Alpert testified that he felt "cornered" in the back of the apartment complex. The State questioned Alpert extensively about his ability to retreat from Baker. The prosecutor repeatedly asked Alpert whether he could have gone in a different direction to get away from Baker.

> Q. . . . You said, "[H]e cornered me." Does that sound like what you said?
> A. Correct.
> Q. But you were on a street, you could go right or left or back where you came from or the other direction. Correct?
> A. Correct.
> Q. So what did you mean by "cornered"?
> A. I have no idea.

And in closing argument, the State suggested Alpert had the ability to walk away from the encounter. The prosecutor told the jury that Alpert "walks three miles a day, he goes to the batting cage. Suddenly at that very moment he ran out of gas so he decided to turn around and shoot Mr. Baker." In rebuttal, the prosecutor argued Alpert "didn't have to go back around [the building]. He could have gone straight, or he could have said to Mr. Baker, I'm going to leave, I've decided to leave."

The testimony, emphasized by the State's argument, presented sufficient evidence for a jury to conclude objectively that flight was a reasonable alternative

to shooting Baker. The facts were enough to support Alpert's request for a no duty to retreat instruction.

Still, the State contends Alpert was not legally entitled to a no duty to retreat instruction. It first argues that Alpert was trespassing and did not have a right to be in the apartment complex common area when Baker confronted him. Citing In re Personal Restraint of Harvey, 3 Wn. App. 2d 204, 415 P.3d 253 (2018), the State argues, "[I]t is not error to refuse to instruct the jury that the defendant has no duty to retreat" when "the defendant is not in a place that he has a right to be."

In Harvey, the defendant shot and killed two men in the parking lot of an apartment building. Harvey, 3 Wn. App. 2d at 207. Neither Harvey nor the victims lived in the building or had an ownership interest in the property. Harvey, 3 Wn. App. 2d at 207. The court noted that "[u]nder Washington common law, a nonresident must be licensed to enter the common areas of a multiunit dwelling and the incursion must fall within the scope of that license." Harvey, 3 Wn. App. 2d at 216. That license may be express or implied. Harvey, 3 Wn. App. 2d at 216; see Singleton v. Jackson, 85 Wn. App. 835, 839-40, 935 P.2d 644 (1997). The court concluded that because Harvey had neither express nor implied consent to enter the apartment complex parking lot, he was not "in a place where he had a right to be, [and] he was not entitled to a no duty to retreat instruction." Harvey, 3 Wn. App. 2d at 219.

Here, Moffett expressly invited Alpert to her apartment to visit his grandson. Although Alpert knew that he was over two hours late, he believed

8

that Moffett could still be home. When he discovered nobody was home, Alpert decided to rest in the shade near the rear of the apartment to wait for Moffett and his grandson to return. Before he could do so, Baker confronted him. Unlike Harvey, Alpert produced "some evidence" to support his theory that he had a right to be outside Moffett's apartment when Baker confronted him. See Walden, 131 Wn.2d at 473.

The State next argues that Alpert waived his right to a no duty to retreat jury instruction because he successfully argued against the State's request for a first aggressor instruction. Citing Harvey, the State asserts that Alpert "cannot be heard to complain when the trial court refuses to give" a no duty to retreat instruction after he successfully advocates against a viable first aggressor instruction. Harvey, 3 Wn. App. 2d at 221.

A "first aggressor" instruction explains to the jury that the State may disprove self-defense "by proving beyond a reasonable doubt that the defendant provoked the need to act in self-defense." State v. Grott, 195 Wn.2d 256, 268, 458 P.3d 750 (2020). A first aggressor cannot claim self-defense "because 'the aggressor's victim, defending himself against the aggressor, is using lawful, not unlawful, force; and the force defended against must be unlawful force, for self-defense.' " State v. Riley, 137 Wn.2d 904, 911, 976 P.2d 624 (1999) (quoting 1 WAYNE R. LAFAVE & AUSTIN W. SCOTT, JR., SUBSTANTIVE CRIMINAL LAW § 5.7, at 657-58 (1986)). A first aggressor instruction is appropriate "[w]here there is credible evidence from which a jury can reasonably determine that the defendant provoked the need to act in self-defense." Riley, 137 Wn.2d at 909-10.

9

Generally, a viable first aggressor instruction is not compatible with a no duty to retreat instruction. Harvey, 3 Wn. App. 2d at 221. "[I]f a defendant was the first aggressor, he cannot rely on the defense of self-defense unless he does first retreat." Harvey, 3 Wn. App. 2d at 220. A no duty to retreat instruction "will misstate the law if it is given in a case where there is evidence that the defendant was the first aggressor but he or she persuades the trial court not to give a first aggressor instruction." Harvey, 3 Wn. App. 2d at 220.

Whether the State produced sufficient evidence to support a first aggressor instruction is a question of law reviewed de novo. State v. Bea, 162 Wn. App. 570, 577, 254 P.3d 948 (2011). "[W]ords alone do not constitute sufficient provocation" for a first aggressor instruction. Riley, 137 Wn.2d at 911. And the provoking act cannot be the actual assault charged. Bea, 162 Wn. App. at 577; State v. Kidd, 57 Wn. App. 95, 100, 786 P.2d 847 (1990).

Here, the State argued for a first aggressor instruction for Alpert's murder charge, but Alpert successfully argued against it. The State claimed it was entitled to the instruction because Baker's confrontation with Alpert was only verbal, and it was Alpert who "put the firearm in play that escalated the situation." But testimony from the State's witnesses describes Baker's behavior as both verbally and physically aggressive before Alpert reached for his gun. According to the witnesses, Baker called down from his balcony to tell Alpert to leave. Alpert said he was there to visit Moffett. Neighbor Lisa Rodriguez testified that when Alpert failed to leave, Baker became "nasty." Dalton told Baker to calm down and leave Alpert alone. Instead, Baker descended from his apartment to

10

confront Alpert. Seeing Baker's behavior, Dalton was concerned "there was going to be a problem" and told Rodriguez to call 911. Alpert backed away when he saw Baker coming toward him. Baker followed Alpert around the building.[2]

Viewing the testimony in the light most favorable to the State, the evidence did not support the State's contention that Alpert was the first aggressor. Because sufficient evidence did not support the State's request for a first aggressor instruction, Alpert did not waive his right to a no duty to retreat instruction by successfully arguing against it.

The trial court erred in refusing to instruct the jury that Alpert had no duty to retreat from his encounter with Baker. We reverse Alpert's second degree murder conviction and remand for a new trial.

B. Second Degree Assault

Alpert contends he was also entitled to a no duty to retreat instruction for the assault charge. The State argues again that Alpert waived his right to a no duty to retreat jury instruction because he successfully argued against the State's request for a first aggressor instruction. Because evidence of the assault charge supports a first aggressor instruction, we agree with the State.

As discussed above, a first aggressor instruction is appropriate when credible evidence would allow a jury to determine that the defendant provoked the need to act in self-defense. Riley, 137 Wn.2d at 909-10. "[W]here there is evidence that the defendant engaged in a course of aggressive conduct, rather than a single aggressive act, 'the provoking act can be part of a "single course of

_____

[2] The testimony describes Alpert as a "thin," 60-year-old man with spinal stenosis and severe arthritis, about five feet six inches tall, and Baker as "a pretty big guy" over six feet tall.

11

conduct." ' " <u>State v. Grott</u>, 195 Wn.2d 256, 273, 458 P.3d 750 (2020) (quoting <u>State v. Sullivan</u>, 196 Wn. App. 277, 290, 383 P.3d 574 (2016)).

Gredvig testified that he heard Alpert "running his mouth" after getting off the bus. Alpert was not directly facing Gredvig but he was making a "come on" or beckoning motion. Alpert also flipped off Gredvig. When Alpert turned and made eye contact, Gredvig "realized" Alpert was trying to engage him. Gredvig started to get angry and asked Alpert if he really wanted to have an altercation on a public corner in "broad daylight." The two men swore at each other while walking down the street.

Gredvig had planned to walk to the park but decided to follow Alpert because he wanted to find out why Alpert was acting hostile toward him. Alpert was agitated and "egging" on Gredvig to a confrontation. Alpert took off his coat, dropped all his belongings on the ground, reached down, and pulled out a gun. Gredvig continued walking forward and Alpert chambered a round in the gun. Gredvig said he was standing about eight feet away when Alpert "cocked" the gun and a "bullet flew out."

Viewing this evidence in a light most favorable to the State, a jury could determine that Alpert engaged in an aggressive course of conduct toward Gredvig, provoking the need to act in self-defense. <u>See Grott</u>, 195 Wn.2d at 273. Because sufficient evidence supported the State's request for a first aggressor instruction and Alpert successfully argued against it, he cannot "complain" that the trial court refused to instruct the jury that he had no duty to retreat. <u>See</u>

Harvey, 3 Wn. App. 2d at 221. The trial court did not err in its refusal to provide a no duty to retreat instruction as to the assault charge.

## II. CrR 3.1 Right to Counsel Violation

Alpert argues the trial court improperly admitted evidence in violation of his CrR 3.1 right to counsel. The State claims Alpert's request for counsel was equivocal and any error was harmless. We conclude that Alpert unequivocally invoked his right to counsel and that the evidence tainted by the violation of Alpert's CrR 3.1 right to counsel must be suppressed. But we also conclude that overwhelming untainted evidence led to harmless error related to Alpert's conviction for second degree assault of Gredvig.

We review challenged findings of fact from an evidentiary hearing for substantial evidence and review de novo whether the findings of fact support the trial court's conclusions of law. State v. Pierce, 169 Wn. App. 533, 544, 280 P.3d 1158 (2012). Unchallenged findings of fact are verities on appeal. Pierce, 169 Wn. App. at 544.

CrR 3.1 creates a right to counsel " 'beyond the requirements of the Constitution.' " State v. Templeton, 148 Wn.2d 193, 211, 59 P.3d 632 (2002) (quoting Heinemann v. Whitman County Dist. Court, 105 Wn.2d 796, 802, 718 P.2d 789 (1986)).[3] Under CrR 3.1(b)(1), the right to a lawyer accrues "as soon as feasible" after a defendant is "taken into custody." "At the earliest opportunity

---

[3] Alpert also claims violation of his Fifth Amendment right to counsel. Because any statements challenged under the Fifth Amendment would be the same as those tainted by the CrR 3.1 violation, we do not reach that issue.

a person in custody who desires a lawyer shall be provided access" to communicate with an attorney. CrR 3.1(c)(2).

The request for an attorney must be unequivocal. Pierce, 169 Wn. App. at 545. "That is, the suspect 'must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.' " State v. Nysta, 168 Wn. App. 30, 41, 275 P.3d 1162 (2012) (quoting Davis v. United States, 512 U.S. 452, 459, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994)). Although the request for counsel must be unequivocal, a suspect "need not rely on talismanic phrases or 'any special combination of words' " to invoke his rights. Bradley v. Meachum, 918 F.2d 338, 342 (2d Cir. 1990) (quoting Quinn v. United States, 349 U.S. 155, 162, 75 S. Ct. 668, 99 L. Ed. 964 (1955)). After an unequivocal request, officers must make " 'reasonable efforts' " to connect the defendant with an attorney. State v. Pierce, 169 Wn. App. 533, 548, 280 P.3d 1158 (2012)[4] (quoting State v. Kirkpatrick, 89 Wn. App. 407, 414, 948 P.2d 882 (1997)).

Here, Marysville police arrived at the apartment building shortly after Alpert shot Baker. Detective Craig Bartl questioned Alpert while standing "in the street" at the scene. Detective Bartl read Alpert Miranda[5] warnings. Alpert waived his rights, agreed to speak to the detective, and gave Detective Bartl permission "to audio record" their conversation. But after about five minutes of questioning, Alpert announced, "I'm just going to be quiet now, cuz my attorney is

---

[4] Emphasis omitted.

[5] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

14

named Michael J. Longyear. He's at 801 2nd Avenue. 1415 Norton Building." Detective Bartl asked, "So are you done talking?" Alpert replied, "Yes sir." Detective Bartl again asked Alpert for his name and then terminated the interview because Alpert "invoked his . . . Constitutional Rights." Officers placed Alpert in the back of a patrol car. Detective Bartl did not tell other officers that Alpert had invoked his rights or attempt to put Alpert in contact with an attorney.

After an evidentiary hearing, the trial court determined that Alpert "did not unequivocally ask to speak to an attorney at all at any point" and that Detective Bartl did not need to make reasonable efforts to connect Alpert with counsel. But the record shows that Alpert clearly communicated that he would not answer any more questions and gave Detective Bartl the name and contact information for his attorney. A reasonable officer would understand that a person who invokes their right to remain silent and provides the name and contact information for an attorney while being detained and questioned is expressing a desire to speak with that attorney. Indeed, in the transcript of the recorded interview, Detective Bartl acknowledged that Alpert "invoked his . . . Constitutional Rights" and terminated the interview. Yet the detective made no effort to connect Alpert with an attorney as required by CrR 3.1. The record does not support the trial court's conclusion that Alpert's request for counsel was equivocal.

"Where there is a violation of the [CrR 3.1] right to counsel, the remedy is suppression of evidence tainted by the violation." State v. Copeland, 130 Wn.2d 244, 282, 922 P.2d 1304 (1996). In determining whether statements obtained in violation of CrR 3.1 are tainted, "we presume a lawyer would have told [a criminal

defendant] to remain silent: '[A]ny lawyer worth his [or her] salt will tell the suspect in no uncertain terms to make no statement to police under any circumstances.' " Kirkpatrick, 89 Wn. App. at 414[6] (quoting Watts v. Indiana, 338 U.S. 49, 59, 69 S. Ct. 1357, 93 L. Ed. 1801 (1949) (Jackson, J., concurring)). Alpert made several statements to officers about his interaction with Baker after he invoked his right to counsel. We remand to the trial court to identify and suppress for retrial the statements related to Alpert's murder charge that were tainted by the violation of his right to counsel under CrR 3.1.

Alpert also made statements related to his assault of Gredvig. Detective Chris Jones testified that while at the hospital for injuries sustained from contact with the K-9 officer, Alpert made comments "about [how] the bus driver wanted him to sit down, and there was some type of argument where someone else intervened." These statements were tainted by the violation of Alpert's CrR 3.1 right to counsel.

After identifying evidence tainted by a CrR 3.1 violation, we engage in a harmless error analysis. State v. Templeton, 148 Wn.2d 193, 220, 59 P.3d 632 (2002). "A violation of a court rule is harmless if there is no reasonable probability that the error materially affected the outcome of the trial." State v. Scherf, 192 Wn.2d 350, 375, 429 P.3d 776 (2018). Because we reverse and remand Alpert's murder conviction on separate grounds, our harmless error analysis is limited to Alpert's second degree assault conviction.

---

[6] Second alteration in original.

The State provided extensive untainted evidence in support of the second degree assault charge. The bus cameras captured much of Alpert's interaction with Gredvig and the court admitted the videos as evidence at trial. The videos show Gredvig leave through the front of the bus and Alpert exit through the rear, yelling, "Fucking dumbasses" as he steps off the bus. Alpert is behind Gredvig as both men walk up the street in the same direction. Gredvig pauses to look behind him, and Alpert quickly walks around him and flips off Gredvig during a visibly hostile exchange as both keep walking, Gredvig now behind Alpert. The videos show Alpert cross the street, turn the corner, and Gredvig follows. Both men move off-camera. Then Alpert reappears in the videos, walking backward until he hits a light pole, pointing a gun at Gredvig. Gredvig is facing Alpert and appears to be holding a cell phone.

Alpert testified about his hostile exchange with Gredvig. He said that he flipped off Gredvig, who then threatened to "kick [his] ass." According to Alpert, Gredvig walked toward him and Alpert fell to the ground. While on the ground, Alpert reached into his pocket, put a magazine in his gun, and pulled out his gun. Alpert stood up and warned Gredvig to stop coming toward him as he backed into the pole. When Gredvig failed to stop, Alpert raised the gun "indexed"[7] and "ratchet[ted]" a round.

Gredvig testified that Alpert reached into his belongings and pulled out a gun. He then pointed the gun toward Gredvig's face and a "bullet flew out." Gredvig's daughter was standing on the opposite side of the street, waiting for

---

[7] Alpert testified that "indexed" means "a two-hand grip with my [index] finger alongside outside the trigger guard," not on the trigger.

17

her father. She testified that she remembered Alpert and Gredvig "arguing." She saw Alpert drop his belongings on the ground, reach inside, pull out a gun, and point the gun at Gredvig. An independent witness testified to an "angry conversation" between Alpert and Gredvig. And another witness testified that Alpert was "clearly irate." Both witnesses said that Alpert had a gun.

There is no reasonable probability that Alpert's tainted statements to police affected the outcome of the second degree assault charge. Trial testimony from Alpert, Gredvig, and other witnesses, combined with the bus videos, was overwhelming untainted evidence supporting his conviction. See Scherf, 192 Wn.2d at 375.

III. Evidentiary Issues

Alpert alleges two evidentiary errors require reversal of his second degree assault conviction.

A. Washington Privacy Act (WPA), Chapter 9.73 RCW

1. Waiver

Alpert claims the WPA precluded admission of his recorded police interview with Detective Bartl because the recording does not include the detective informing Alpert of his constitutional rights.[8] The State contends Alpert waived any error because he failed to object to the recording on those grounds at trial. We agree with the State.

We may refuse to review any claim of error not raised in the trial court. RAP 2.5(a). "[A] litigant cannot remain silent as to claimed error during trial and

---

[8] Under RCW 9.73.090(1)(b)(iii), video recordings made of arrested persons by police officers must include the arrested person being "fully informed of his or her constitutional rights."

later, for the first time, urge objections thereto on appeal." State v. Guloy, 104 Wn.2d 412, 421, 705 P.2d 1182 (1985). An appellate court may review an error for the first time if the alleged error was manifest, affecting a constitutional right. See State v. O'Hara, 167 Wn.2d 91, 97, 217 P.3d 756 (2009). "[T]he error must be 'manifest' and truly of constitutional dimension." State v. Kirkman, 159 Wn.2d 918, 926, 155 P.3d 125 (2007).

Alpert argued below that his recorded statements were inadmissible under CrR 3.1. He did not challenge the recording under the WPA. Admission of evidence in violation of the WPA is a statutory violation and does not affect a constitutional right. State v. Cunningham, 93 Wn.2d 823, 831, 613 P.2d 1139 (1980). Because the admission of evidence is not of constitutional magnitude, we will not review it for the first time on appeal. Alpert waived his claim of error under the WPA.

2. Ineffective Assistance of Counsel

Alpert argues his attorney's failure to object to the admission of his recorded interview under the WPA amounts to ineffective assistance of counsel. We disagree.

To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) deficient performance and (2) prejudice. State v. Hendrickson, 129 Wn.2d 61, 77-78, 917 P.2d 563 (1996). We need not "address both components of the inquiry if the defendant makes an insufficient showing on one." Strickland v. Washington, 466 U.S. 668, 697, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). "If it is easier to dispose of an ineffectiveness claim on the ground of

19

lack of sufficient prejudice, . . . that course should be followed." Strickland, 466 U.S. at 697. A defendant alleging ineffective assistance of counsel shows prejudice when there is a reasonable probability that but for counsel's error, the result of the trial would have been different. Hendrickson, 129 Wn.2d at 78.

Even without Alpert's recorded interview, the State presented extensive evidence about the assault of Gredvig. As discussed above, Alpert testified about the angry altercation and pointing his gun at Gredvig. Gredvig discussed Alpert's aggressive behavior and being held at gunpoint. Gredvig's daughter and two other witnesses testified that Alpert was angry and pointed his gun at Gredvig. Finally, the bus videos also captured Alpert's belligerent behavior and Alpert pointing his gun at Gredvig's face. Given the testimony at trial and the bus videos, exclusion of Alpert's recorded statement would not have altered the outcome of the trial. Because Alpert cannot show prejudice, counsel was not ineffective.

B. Impeachment Evidence

Alpert contends the trial court improperly excluded impeachment evidence offered to show Gredvig's bias. We disagree.

We review a trial court's decision to admit or exclude evidence for abuse of discretion. State v. Gunderson, 181 Wn.2d 916, 922, 337 P.3d 1090 (2014). A trial court abuses its discretion when a decision is manifestly unreasonable or based on untenable grounds or reasons. Gunderson, 181 Wn.2d at 922. We review a court's limitation on the scope of cross-examination for manifest abuse of discretion. State v. Darden, 145 Wn.2d 612, 619, 41 P.3d 1189 (2002).

Both the federal and state constitutions guarantee the right to confront and cross-examine adverse witnesses. U.S. CONST. amend VI; WASH. CONST. art. I, § 22; Darden, 145 Wn.2d at 620. Yet the right to cross-examination is not absolute. Darden, 145 Wn.2d at 620. "The confrontation right and associated cross-examination are limited by general considerations of relevance." Darden, 145 Wn.2d at 621. A trial court may reject lines of questions "that only remotely tend to show bias or prejudice." State v. Kilgore, 107 Wn. App. 160, 185, 26 P.3d 308 (2001). But the more important the witness is for the prosecution's case, the more latitude the defense should have to explore issues of motive, bias, and credibility. Darden, 145 Wn.2d at 619.

Gredvig testified that he encountered Alpert on his way to visit his daughters at a nearby park. On cross-examination, Gredvig admitted that in June 2017, he did not have custody of his daughters because he "was in the middle of a CPS[9] case." Alpert's attorney sought to impeach Gredvig with evidence that he was close to regaining custody of his daughters, arguing it showed bias and motive for his testimony. The attorney explained, "I think in the eyes of CPS, it's very different if he's chasing someone and instigating a physical fight than if he's the victim."

The trial court concluded the evidence was not relevant. The judge did not "see what potentially the CPS involvement would have to do [with] whether he's about to get his child back" in a "situation like this, where it does not appear this was a thought-out situation." The court also noted that its experience with

---

[9] Child Protective Services.

dependency proceedings did not support Alpert's argument that the incident would impact Gredvig's CPS case.

That Gredvig had almost regained custody had some probative value. Even so, we will not find an abuse of discretion just because we may have decided the issue differently. L.M. v. Hamilton, 193 Wn.2d 113, 134-35, 436 P.3d 803 (2019). The trial court exercised its broad discretion to exclude evidence of remote probative value. We cannot say that the court made this decision on untenable grounds or for untenable reasons.

IV. Cumulative Error

Alpert argues that cumulative error undermined the fairness of his trial. Because we reverse Alpert's second degree murder conviction, we consider this claim as to only the second degree assault conviction.

The cumulative error doctrine requires reversal when the combined effect of several errors denies the defendant a fair trial. State v. Weber, 159 Wn.2d 252, 279, 149 P.3d 646 (2006). The doctrine does not apply when "the errors are few and have little or no effect on the outcome of the trial." Weber, 159 Wn.2d at 279. The trial court erred by admitting evidence obtained in violation of Alpert's CrR 3.1 right to counsel but, as described above, the error was harmless and did not affect the outcome of the trial. Cumulative error did not undermine the fairness of Alpert's trial.

We affirm Alpert's conviction for second degree assault of Gredvig but reverse his conviction for second degree murder of Baker and remand for a new

No. 79147-8-I/23

trial subject to suppression of the evidence tainted by the violation of Alpert's right to counsel.

WE CONCUR:

23