# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 56024-1-II |
| Respondent, | |
| v. | |
| DOUGLAS R. CLARK, | UNPUBLISHED OPINION |
| Appellant. | |

CRUSER, A.C.J. – Douglas Clark was charged with first degree possession of stolen property: a trailer that he testified was brought to him for him to perform custom work on. At trial, his testimony was contradictory to that of the State's witnesses, and the prosecutor pointed out these discrepancies in closing argument. The jury found Clark guilty. Clark appeals, arguing that the State committed prosecutorial misconduct in its closing argument and that, alternatively, he was denied effective assistance of counsel when defense counsel failed to object to the prosecutor's remarks.

We hold that Clark has not established grounds for reversal of his conviction. Accordingly, we affirm.

FACTS

Around 5:00 p.m. on May 25, 2020, a woman named Ruby[1] called the police to report a stolen trailer on her property. Corporal Timothy Ripp and Deputy Sean Simington were dispatched. When they arrived at the property, Clark was standing in the driveway. Clark was living in a travel trailer[2] outside Ruby's house at the time.

Clark got into Corporal Ripp's patrol vehicle, followed by Deputy Simington in another vehicle, and Clark showed them where the trailer was parked. The officers estimated that the trailer was parked one to two miles down the road from Ruby's house. The trailer's vehicle identification number (VIN) plate was missing, but the officers were able to find the VIN on a faded sticker. Deputy Simington ran a search for the trailer's VIN, and it came back stolen. Clark was then arrested and charged with first degree possession of stolen property.

At trial, Corporal Ripp and Deputy Simington testified to the facts set forth above. Deputy Simington further testified that Ruby called to report the missing trailer after discovering on Facebook that it was stolen. Corporal Ripp testified that, as he drove Clark from Ruby's house to the location of the trailer, Clark stated that he moved the trailer down the road "as soon as he found out it was stolen." Report of Proceedings (RP) at 130.

In addition, the State presented testimony by GK. GK is best friends with Ruby's daughter and was present at Ruby's house on May 24 and 25. GK testified that she got up to get a glass of

---

[1] This opinion uses Ruby's first name because her last name is unclear from the record. The spelling of her name is also inconsistent, as is the spelling of another person's name (Corey Schaeffer) referenced in the witnesses' testimony. This opinion uses the spelling reflected in the Report of Proceedings (RP).

[2] This travel trailer was not the trailer that was the subject of the charge in this case.

water around midnight on May 24-25, and she saw headlights in the driveway. The headlights were coming from Clark's truck, which was hauling a trailer, and GK went outside to help Clark park the trailer. GK testified that, in the morning, Ruby "looked up the trailer or something like that and that's when they found out that it was stolen." *Id.* at 118. On cross examination, when asked whether Ruby instructed Clark to remove the trailer, GK responded, "She said we needed to contact the person and find out where it came from." *Id.* at 123.

Clark also took the stand. He is a self-employed welder and diesel mechanic engaged in building custom trailers. He testified that two people, Corey Schaeffer and someone named Kenny, drove to Ruby's property with two U-Haul trailers and a truck, towing the trailer into the yard. [3] Schaeffer told Clark about the work he wanted done on the trailer, and Clark wrote up a receipt for the work. Normally, he has the customers sign the receipt, but Schaeffer was "too busy to leave," so Clark did not have a signed receipt from Schaeffer. *Id.* at 154. The receipt indicated that it was written up on May 24, but the trailer was delivered "[i]n the middle of the night," around 12:30-1:00, on May 24-25. *Id.* at 155. GK's mom was apparently dating Schaeffer, and Clark testified that she was in the truck with them that evening.

The following exchange took place on Clark's direct examination:

Q       Were you aware that this trailer was gonna be brought over to the property?
A       No, just what [GK] had told me that Corey and Kenny had a trailer they wanted some work done to.
Q       Okay. And so, it's brought over, you park it. Was [GK] accurate as to it was parked behind the house there on the side of the house?
A       It was parked right in the middle of the lawn.
. . . .
Q       So, the testimony was that this was about 12:30, whatever, middle of the night.
A       Yes, sir.

---

[3] GK had previously testified that she did not see any U-Haul trucks on the property that night.

3

Q        Police weren't called until 5:00 the next afternoon?
A        Right.
Q        When did you find out that the trailer may have been stolen?
A        I guess when the officers drove up there. Ruby had told me to get it off the lawn. That's all she said.
Q        Okay. So, what did you do?
A        Backed it up into the trees to get it off the -- get it off the lawn and when I guess she realized it was stolen or whatever on this Facebook or whatever, she said get it off my property.
Q        And what did you do?
A        I put it on the blacktop.
Q        Where'd you -- where did you take it?
A        Up over this little hill into the first wide spot.
Q        Okay. And why there?
A        Well, why not? I mean I just wanted to get it off the property.
Q        Okay. Is that the first you heard that it may have been stolen?
A        Yes.
Q        And then so, like 16 hours later or so the police show up?
A        Right.

*Id.* at 157-59. On cross examination, the State asked Clark about his statement that Ruby had seen that the trailer was stolen on Facebook, but Clark denied that Ruby told him it was stolen.

The State also asked Clark about a statement that he gave to Deputy Simington after being advised of his *Miranda*[4] rights. According to Deputy Simington, Clark stated that GK had asked him to go to the location of the trailer with her, one to two miles away, to meet Schaeffer and Kenny to pick up the trailer. Clark explained that Schaeffer contacted GK regarding the work to be done on the trailer.[5] After speaking with Schaeffer, GK asked Clark to go to the location of the trailer if Schaeffer did not arrive at Ruby's residence before Clark and GK left. But, since Schaeffer arrived while they were still there, Schaeffer dropped off the trailer himself.

---

[4] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[5] GK had previously testified that she did not get any calls from Schaeffer.

The State re-called both GK and Deputy Simington. GK testified that her mom was not present the night that the trailer was brought to the house, and that the only vehicle she saw was Clark's truck towing the trailer. Deputy Simington testified that Clark had mentioned Schaeffer, but did not say anything about doing welding or painting work on the trailer, nor did Clark show him the receipt he had written up for the work.

Noting the inconsistencies between the witnesses' testimony, the prosecutor stated the following during closing argument:

> The -- this doesn't make any sense. It doesn't work. His story. (Indiscernible). The most telling point out of everything. Those officers took his statements, wrote down his statements at the time. *And then when he testified, what did he say? Basically, the officers were lying. That the officers made all this up. Well, not only the officers. They weren't the only people lying. It was -- it has to have been [GK] as well, because her version or observation of what happened was totally different than what he says happened. Completely different.* His story about [GK] coming up to him and saying hey, we have to go down and get this trailer and riding with him down there. That was false. Cause you heard her testify. We didn't drive -- I didn't see him earlier. I didn't go anywhere with him. Why would someone say that when it wasn't true? Why would someone say that all these other people pulled trailers up and parked them on the front lawn when it wasn't true? Why would someone do that?
>
> Well, we're back to circumstantial evidence. If someone is giving a story that's demonstratively false, one can infer from that that they're hiding something. What they're hiding in this case is that the defendant had knowledge that the trailer was stolen. He tried to tell you he had no knowledge. But he knew. He had to have known. Because he took that trailer off the property and down to the, you know, to Tahuya, took it down there and then left, cause he knew it was stolen. But he wasn't told that until the next day. Until the next, the very next day. So, there's no way he could have known it was stolen originally right? Because there's -- Ruby wasn't there. How did he know the truck or was stolen? *12:30 in the morning. Drove it off.* How did he know that? Well, don't know. But we know the next day about 5:00 in the afternoon or so we, at that point, police were called and they showed up and it was a stolen vehicle.

*Id.* at 208-09 (emphasis added). Clark did not object to these statements.

The trial court gave instructions to the jury both at the beginning of trial and before the parties' closing arguments. The jury was told to listen carefully to the witnesses' testimony, that the evidence was comprised of the testimony of the witnesses and the exhibits that were admitted, and that the lawyers' statements were not evidence. The trial court also instructed the jury that its members were the sole judges of the credibility of the witnesses and of the weight to be given to each witness's testimony.

The jury found Clark guilty of first degree possession of stolen property. Clark received a sentence of two months, allowing for alternatives such as electronic home monitoring. Clark appeals.

## DISCUSSION

### I. PROSECUTORIAL MISCONDUCT

Clark argues that the State committed prosecutorial misconduct by mischaracterizing the evidence—namely, by stating that Clark moved the trailer at 12:30 a.m.—and by shifting the burden of proof in its closing argument when it asserted Clark's testimony implied that the State's witnesses were lying. The State argues that Clark's own testimony supported the assertion that Clark moved the trailer at 12:30 a.m. and that the State properly commented on Clark's credibility in its closing argument and that, regardless, Clark has not shown that the arguments were flagrant and ill-intentioned or that they could not have been remedied by a curative instruction. We disagree with Clark.

### A. LEGAL PRINCIPLES

To prevail on a claim of prosecutorial misconduct, the defendant must show that the prosecutor's conduct was both improper and prejudicial "in the context of the record and all of the

circumstances of the trial." *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012) (plurality opinion). A showing of prejudice requires the defendant to demonstrate a substantial likelihood that the misconduct affected the verdict. *Id.*

In order to obtain reversal on a claim of prosecutorial misconduct where, as here, the defendant did not object below, the defendant must show that the prosecutor's conduct was improper, and the misconduct so flagrant and ill-intentioned that any prejudicial effect of the misconduct could not have been obviated by a curative instruction. *State v. Gouley*, 19 Wn. App. 2d 185, 201, 494 P.3d 458 (2021), *review denied*, 198 Wn.2d 1041 (2022); *State v. Emery*, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012). On the initial question of waiver, "[r]eviewing courts should focus less on whether the prosecutor's misconduct was flagrant or ill[-]intentioned and more on whether the resulting prejudice could have been cured." *Emery*, 174 Wn.2d at 762. Therefore, if a non-objecting defendant fails to show that the misconduct was incurable, the claim fails and we need not go further. *Id.* at 764; *Gouley*, 19 Wn. App. 2d at 201.

If a defendant makes the requisite showing and overcomes waiver, we review the claim to determine whether there is a substantial likelihood that the misconduct affected the verdict. *Gouley*, 19 Wn. App. 2d at 201. Importantly, "a defendant might succeed in showing incurable prejudice from the improper statements and yet fail to demonstrate a substantial likelihood that the misconduct affected the verdict." *Id.*; *see also Emery*, 174 Wn.2d at 764 n.14.

B. ANALYSIS

*1. Mischaracterization of the Evidence*

Clark argues that the State committed prosecutorial misconduct in its closing argument by asserting that Clark knew the trailer was stolen because he drove it off the property in the middle of the night, even though no evidence supported this assertion.[6]

Although the testimony was inconsistent between witnesses, there was no testimony that Clark moved the trailer down the road at 12:30 a.m. GK testified that Clark arrived with the trailer around midnight or 12:30 a.m. and that she helped Clark back the trailer in and park. Corporal Ripp testified that Clark claimed he moved the trailer "as soon as he found out it was stolen." RP at 130. And GK testified that Ruby looked up the trailer and found out it was stolen the following morning, though Clark disputed that Ruby told him that the trailer was stolen. Nevertheless, the

---

[6] Clark equates the prosecutor's statement regarding the moving of the trailer at 12:30 a.m. to those of the prosecutors in *State v. Belgarde*, 110 Wn.2d 504, 755 P.2d 174 (1988) and *State v. Pierce*, 169 Wn. App. 533, 280 P.3d 1158 (2012), but those cases are distinguishable. In *Belgarde*, the prosecutor's comments injected racial bias into the case and reflected the prosecutor's own inflammatory opinions, which would have been improper even absent their racism and fabrication of broader public opinion about the American Indian Movement (AIM). *See* 110 Wn.2d at 508 (after defendant testified he was affiliated with AIM, prosecutor made remarks that "AIM was a 'deadly group of madmen' " and that " 'the people are frightened of AIM.' "). Additionally, the prosecutor's comments in *Pierce* involved an invention of an entire conversation out of whole cloth with *no* basis anywhere in the record. 169 Wn. App. at 555 ("there was no evidence from which the jury could have inferred that Pat Yarr pleaded for mercy for himself and his wife, that Pat Yarr threatened Pierce, that the Yarrs looked into each others' eyes, or that Pierce told them to say their 'goodbyes' before killing them.").

testimony does not suggest that Clark moved the trailer down the road at 12:30 a.m.; rather, that is the time at which the trailer arrived on Ruby's property.[7]

Therefore, we agree that the prosecutor's comment that Clark moved the trailer in the middle of the night misrepresented the testimony. The relevant inquiry, however, is whether any prejudice from this mischaracterization could have been cured by an instruction. *Emery*, 174 Wn.2d at 762. Defense counsel did not object to the prosecutor's statement. This strongly suggests counsel was not concerned that the jury was in danger of being misled by the prosecutor's remark. *See State v. McKenzie*, 157 Wn.2d 44, 53 n. 2, 134 P.3d 221 (2006) ("the absence of an objection by defense counsel 'strongly suggests to a court that the argument or event in question did not appear critically prejudicial to an appellant in the context of the trial.' ") (emphasis omitted) (quoting *State v. Swan*, 114 Wn.2d 613, 661, 790 P.2d 610 (1990)). A curative instruction by the court could easily have remedied any misstatement by the prosecutor. Moreover, the jury was instructed both at the beginning of the trial and shortly before closing arguments that the lawyers' arguments are not evidence. The jury was also instructed to listen carefully to the testimony of the witnesses, and that the jury members were the sole judges of the credibility of the witnesses. We presume that the jury has followed the trial court's instructions. *State v. Kirkman*, 159 Wn.2d 918, 928, 155 P.3d 125 (2007).

---

[7] The State argues that Clark's own testimony, which was inconsistent with his prior statements to the officers, suggested that Clark moved the trailer at 12:30 a.m. based on Clark's affirmative answer to the question from his counsel, "[a]nd then so, like 16 hours later or so the police show up?" after asking about the first time Clark heard the trailer may have been stolen. Br. of Resp't at 6 (quoting RP at 159). Although this exchange is confusing, viewed in context of the questioning leading to these statements, one could infer that counsel was referring to 16 hours after the trailer arrived at the residence. *See* RP at 157-58 (testimony indicated that trailer was brought to the property around 12:30 a.m., and police were called at 5:00 p.m.).

Because any misstatement by the prosecutor regarding the evidence could have been obviated by a curative instruction, we hold that Clark has waived his prosecutorial misconduct claim on this basis. *See Emery*, 174 Wn.2d at 764.

*2. Shifting Burden of Proof*

Clark further argues that the State committed prosecutorial misconduct by improperly shifting the burden of proof during its closing argument when it asserted that the jury had to find that the State's witnesses were lying in order to believe Clark's testimony.

In *State v. Fleming*, 83 Wn. App. 209, 213, 921 P.2d 1076 (1996), the prosecutor stated in closing argument:

> Ladies and gentlemen of the jury, *for you to find the defendants, . . . not guilty of the crime of rape in the second degree*, with which each of them have been charged, based on the unequivocal testimony of [the victim] as to what occurred to her back in her bedroom that night, *you would have to find either that [the victim] has lied about what occurred in that bedroom or that she was confused; essentially that she fantasized what occurred back in that bedroom.*

Division One of this court held that "it is misconduct for a prosecutor to argue that in order to acquit a defendant, the jury must find that the State's witnesses are either lying or mistaken," emphasizing that the jury was instead "required to acquit unless it had an abiding conviction in the truth of [the victim's] testimony." *Id.* at 213 (emphasis omitted). Similarly, in *State v. Barrow*, 60 Wn. App. 869, 874-75, 809 P.2d 209 (1991), the prosecutor "told the jury that 'in order for you to find the defendant not guilty on either of these charges, you have to believe his testimony and you have to completely disbelieve the officers' testimony. You have to believe that the officers are lying.' "

These cases are distinguishable. Here, the prosecutor's remarks were inartful insofar as they may have implied that *Clark suggested* that the State's witnesses had lied because Clark's

10

account of events "was totally different." RP at 208. However, the State did not argue that the *jury must find* that the State's witnesses were lying in order to acquit. Rather, the prosecutor argued that Clark's story "doesn't make any sense." *Id.* Specifically, the prosecutor was attempting to demonstrate that Clark's testimony was not credible given the other witnesses' testimony. It is not improper for a prosecutor to "point[ ] out the obvious" when accepting the defendant's version of the facts necessarily means rejecting the State's witnesses' versions of the facts. *State v. Wood*, 19 Wn. App. 2d 743, 773, 498 P.3d 968 (2021), *review denied*, 199 Wn.2d 1007 (2022).

We hold that the prosecutor's remarks did not improperly shift the burden of proof to Clark. Because Clark fails to make the first required showing—that the prosecutor's remarks were improper—his prosecutorial misconduct claim as to this remark also fails.[8]

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Clark argues that he was denied effective assistance of counsel when defense counsel failed to object to the prosecutor's statements described above. The State argues that Clark fails to show any prejudice from defense counsel's failure to object. We agree with the State.

A. LEGAL PRINCIPLES

To prevail on a claim of ineffective assistance of counsel, a defendant must show "(1) that defense counsel's conduct was deficient, . . . and (2) that the deficient performance resulted in prejudice." *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004). Performance is deficient if it falls below an objective standard of reasonableness based on the record established

---

[8] Clark argues that the combined effect of the two arguments he alleges were improper created a substantial likelihood that the misconduct affected the verdict. But as we note above, Clark has identified only one improper remark by the prosecutor, so there is no potential combined effect present in this case.

at trial. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). To establish prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different." *State v. Grier*, 171 Wn.2d 17, 34, 246 P.3d 1260 (2011) (quoting *State v. Kyllo*, 166 Wn.2d 856, 870, 215 P.3d 177 (2009)). We need not address both prongs of the test when the defendant's showing on one prong is insufficient. *State v. Foster*, 140 Wn. App. 266, 273, 166 P.3d 726 (2007).

B. ANALYSIS

Clark focuses primarily on the prejudice prong, assuming that failing to object to improper arguments is deficient performance.[9] Clark argues that he was prejudiced by the arguments the prosecutor was permitted to make without objection because, first, the jury was told that it had to believe the State's witnesses were lying in order to acquit, and second, the misstatement about when Clark moved the truck was the linchpin of an otherwise weak prosecution case. Thus, Clark contends, if curative instructions could have cured these remarks, then counsel was ineffective for not requesting them. We disagree with Clark.

With respect to the first statement at issue about Clark moving the trailer in the middle of the night, as we note above, the jury had been instructed at the beginning of trial and prior to closing argument that the lawyers' statements are not evidence, and that the evidence is comprised of the witnesses' testimony and exhibits. The jury was also told to listen carefully to the testimony of the witnesses. As described above, although the State may have mischaracterized the testimony regarding when Clark moved the trailer down the road, the jury heard the witnesses testify and

---

[9] We note that counsel's decision on whether to object is "[a] classic example of trial tactics" that will only justify reversal in " 'egregious circumstances.' " *State v. Vazquez*, 198 Wn.2d 239, 248, 494 P.3d 424 (2021) (quoting *State v. Crow*, 8 Wn. App. 2d 480, 508, 438 P.3d 541 (2019)).

could draw its own conclusions as to when the trailer was moved and, additionally, draw its own conclusions as to which witnesses were credible. The jury heard evidence that Clark towed the trailer to the property himself, contrary to his statements that others delivered it and asked him to perform work on it; that he moved the trailer one to two miles down the road after being asked to get it off of Ruby's property; and that Ruby told him she thought the trailer was stolen, contrary to Clark's statements that she simply asked him to get it off the lawn. Clark has not shown a reasonable probability that the outcome of the trial would have been different had counsel objected to this argument.

Regarding the second statement at issue, we disagree with Clark's characterization of these remarks. The State did not argue that the jury must find that the State's witnesses were lying in order to acquit Clark. Additionally, the jury members were instructed that they are the sole judges of the credibility of each witness and the weight to be given to the testimony of each witness. Jurors are presumed to follow the court's instructions. *Kirkman*, 159 Wn.2d at 928. Clark again fails to show a reasonable probability that the outcome of the trial would have been different had counsel objected to this remark.

We hold that Clark was not denied effective assistance of counsel when defense counsel failed to object to the prosecutor's remarks during closing argument.

No. 56024-1-II

## CONCLUSION

We hold that Clark has not established grounds for reversal of his conviction. Accordingly, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
CRUSER, A.C.J.

We concur:

_____
VELJACIC, J.

_____
PRICE, J.