IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| STATE OF WASHINGTON, | No. 83546-7-I |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| SPITZER, JAMES ROBERT, | |
| Appellant. | |

BOWMAN, J. — James Robert Spitzer appeals his jury conviction for first degree rape. He argues insufficient evidence supports finding that he inflicted "serious physical injury" during the assault, the prosecutor committed misconduct in closing argument, and the court miscalculated his offender score by including a noncomparable out-of-state conviction. The State cross appeals the trial court's finding that the prosecutor made improper comments during closing argument. We affirm Spitzer's conviction but remand for resentencing.

FACTS

A.U. worked as a nursing assistant at Providence Regional Medical Center in Everett. Just past 6:00 a.m. on June 12, 2021, A.U. was walking to work. As she headed toward the hospital, A.U. noticed Spitzer pass her, walking in the opposite direction. When she walked across the street, A.U. looked back over her shoulder and saw that Spitzer had turned around and was "looking back at [her]." She "froze" as Spitzer started "running" toward her. He reached over

A.U., hit her in the back of the head "very hard," and she fell to the ground "in the middle of the street."  The last thing A.U. remembered was feeling her purse and lunch bag "drop off of [her] arms."

A.U. came to when Spitzer helped her up from the ground by the elbow. He whispered in her ear to " '[a]ct normal or I'm going to slit your throat.' " Spitzer told A.U. to kiss him and to act like they were a couple while he kissed her mouth.  He kept hold of her and started walking her "somewhere."  Spitzer was "very hostile and . . . very aggressive" and started talking about money. Thinking she "was being held for ransom," A.U. told him she would give him all the money he needed.  Spitzer responded, " 'That's not all you're going to give me.  You're going to give me everything that I want,' " and told her he had a gun in his pocket.

Spitzer led A.U. to a wooded area, instructed her to take off her clothes, and told her that they were " 'going to make love.' "  He then raped her for about three hours.  From the beginning, A.U. saw what looked like a black pistol on the ground by her side.  Throughout the rape, Spitzer moved the gun around, including between his legs or "in [her] face."  He also had a knife and talked about "prior acts of violence he had committed."  A.U. "thought [she] was going to die."

When she "could not take it anymore," A.U. faked a seizure and told Spitzer she needed to use a bathroom.  Spitzer agreed and walked her to a nearby Safeway without her shoes on.  On the way, Spitzer made A.U. hold his hand, had her pick a flower, and talked to her as though they "were in a

2

relationship." When they arrived at the Safeway, A.U. went into the women's restroom while Spitzer waited just outside the door. Soon after, a Safeway employee walked into the restroom, and A.U. told her that the man outside the door kidnapped and raped her. The Safeway employee called her manager to the restroom, who then called 911. Police arrested Spitzer outside the bathroom door. Spitzer insisted he did nothing wrong and was just waiting for his "girlfriend."

Emergency medical technicians (EMTs) arrived at the Safeway and evaluated A.U. A.U. told them she experienced a "trauma" and had neck and head pain. EMTs found a golf-ball-sized hematoma on the crown of her head. They then transported A.U. to the hospital for further evaluation.

At the hospital, A.U. underwent a sexual assault examination by a forensic nurse. During the exam, A.U. reported pain all over her body, especially her head, mouth, throat, neck, shoulders, hands, breasts, hips, genitals, knees, and feet. On a scale of 1 to 10, A.U. reported head pain at 8 and genital pain at 9 with some bleeding. The nurse noted that A.U. had head, mouth, neck, and throat tenderness to the touch; knee bruises; and abrasions on her shoulders, thumbs, nipples, genitals, knees, and feet. The nurse saw additional areas of redness to A.U.'s shoulders and lower back. She tried to do a pelvic exam but could not complete it because of A.U.'s "exquisite pain." The nurse described it as "come up off the table kind of pain."

Along with the physical exam, the nurse took DNA[1] swabs from several

---

[1] Deoxyribonucleic acid.

areas on A.U.'s body.  Swabs from A.U.'s breasts and genitals revealed male DNA.  Forensic analysis showed that the DNA was 4.8 billion times more likely to have come from Spitzer than an unrelated individual.  After law enforcement obtained a warrant, a forensic nurse also took DNA samples from Spitzer's genitals.  An analysis of that DNA showed it was 860 octillion times more likely to have come from A.U. than anyone else.

The State charged Spitzer with one count of first degree rape and one count of first degree kidnapping.  The information alleged three alternative means of committing first degree rape—that Spitzer "did use and threatened to use a deadly weapon or what appeared to be a deadly weapon," that he "kidnapped A.U.," and that he inflicted "serious physical injury."  At trial, the court instructed the jury it "need not be unanimous" as to which means.

At the beginning of the State's closing argument, the prosecutor described what happened to A.U. as

> the personification of everyone's worst nightmare:  That you will pass somebody on the street and they will decide to hurt you, not because of who you are, not because of what you believe or what you've said or what you've done, but simply because you're there.

And the prosecutor finished his closing argument by telling the jury, "The very personification of the nightmare that . . . [A.U.] worried about . . . came true.  That nightmare's name is James Spitzer."  The defense objected to neither statement.

The jury found Spitzer guilty on both counts.  Spitzer then moved for a new trial, arguing that the State deprived him of a fair trial because the prosecutor made improper statements during closing argument when he told the jury that Spitzer was "everyone's worst nightmare."  The court agreed that the

statements were improper but denied the motion, concluding that they were not prejudicial given the "overwhelming" evidence of Spitzer's guilt.

At sentencing, the court calculated Spitzer's offender score at 7. The offender score included a Nevada burglary conviction. The court determined that the rape and kidnapping charges merged and dismissed the kidnapping charge. It then sentenced Spitzer at the high end of the standard range on the rape charge to a minimum of 236 months' confinement and a maximum of life imprisonment.

Spitzer appeals and the State cross appeals.

ANALYSIS

Spitzer argues that insufficient evidence supports the jury finding that he inflicted "serious physical injury" when he raped A.U., that the prosecutor engaged in misconduct during closing argument, and that the court erred by including a Nevada conviction for burglary in his offender score. He also argues he received ineffective assistance of counsel because his attorney did not object to the out-of-state conviction. The State cross appeals the trial court's finding that the prosecutor committed misconduct during closing argument.

1. Sufficiency of the Evidence

Spitzer argues that insufficient evidence supports one of the charged alternative means of first degree rape—that he inflicted serious physical injury to A.U. We disagree.

Under article I, section 21 of the Washington Constitution, criminal defendants have a right to a unanimous jury verdict. State v. Owens, 180 Wn.2d

5

90, 95, 323 P.3d 1030 (2014). For alternative means crimes,[2] this may include the right to a unanimous jury determination of how the defendant committed the crime. Id. When there is sufficient evidence to support each of the means to commit the crime, express jury unanimity as to which means it relied on is not required. Id. But if evidence is insufficient to support any one of the means, a particularized expression of jury unanimity is required. Id. Evidence is sufficient if, viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Id. at 99.

Here, the trial court instructed the jury that to convict Spitzer of first degree rape, it must determine that the State proved beyond a reasonable doubt that Spitzer "engaged in sexual intercourse with [A.U] . . . by forcible compulsion" and that Spitzer "(a) used or threatened to use a deadly weapon or what appeared to be a deadly weapon, or (b) kidnapped [A.U.], or (c) inflicted serious physical injury."[3]

Spitzer argues that insufficient evidence supports the alternative mean that he inflicted serious physical injury on A.U. According to Spitzer, the State presented evidence sufficient to prove injury but not that the injury was "serious."

The jury instructions did not define "serious." Indeed, nothing in the first degree rape statute or chapter 9A.44 RCW defines what amounts to "serious"

---

[2] First degree rape is an alternative means crime. See RCW 9A.44.040(1).

[3] RCW 9A.44.040(1)(d) provides a fourth alternative means to first degree rape not charged or instructed here—when a defendant "[f]eloniously enters into the building or vehicle where the victim is situated."

physical injury. Spitzer urges us to apply a dictionary definition to the word. But Division Two of our court determined in Welker that leaving the definition of "serious" to the common experience of the trier of fact aligns with legislative intent:

> The Legislature has not defined the term "serious physical injury," nor is there case law definition. In our view it is neither necessary nor desirable to attempt to do so in a jury instruction. The term speaks for itself, is adaptable to the type of injury in issue and permits argument both pro and con. The jury is usually told it may rely upon common sense and the "common experience of mankind." Judges and lawyers are no better able to explain such ordinary terms than the jurors themselves.

State v. Welker, 37 Wn. App. 628, 638 n.2, 683 P.2d 1110 (1984). And our Supreme Court denied review of the decision. State v. Welker, 102 Wn.2d 1006 (1984).

We later agreed with the analysis in Welker. See State v. Taitt, 93 Wn. App. 783, 791-92, 970 P.2d 785 (1999); see also State v. Wallace, noted at 84 Wn. App. 1049, 1996 WL 734631, at *3[4] ("[t]he Legislature was free to leave the definition of 'serious' up to the jury, because people of common intelligence can understand what constitutes 'serious physical injury' "). Division Three also agrees. See State v. Garcia, No. 30555-4-II, slip op. at 15 (Wash. Ct. App. Aug. 15, 2013) (unpublished), https://www.courts.wa.gov/opinions/pdf/305554. hernandez%20garcia.pdf.

---

[4] We recognize that "Washington appellate courts should not, unless necessary for a reasoned decision, cite or discuss unpublished opinions in their opinions." GR 14.1(c). "However, unpublished opinions of the Court of Appeals filed on or after March 1, 2013, may be cited as nonbinding authorities, if identified as such by the citing party, and may be accorded such persuasive value as the court deems appropriate." GR 14.1(a).

We decline to strictly define the word "serious" and, instead, consider whether any reasonable juror relying on common sense and experience could conclude that A.U.'s injuries were "serious." A.U. reported pain all over her body—her head, mouth, throat, neck, shoulders, hands, breasts, hips, genitals, knees, and feet—consistent with being hit over the head and raped for hours in the woods. And she had abrasions on her feet, thumbs, shoulders, knees, nipples, and genitals. But most significantly, A.U. had genital bleeding and pain she described as a 9 on a scale of 1 to 10. The forensic nurse testified that she could not complete a pelvic exam because A.U. was experiencing "exquisite pain," or "come up off the table kind of pain," during the exam. Spitzer also hit A.U. so hard over the head that it knocked her to the ground and gave her a golf-ball-sized hematoma, and she described that pain as an 8. A.U. testified the pain and bruising lasted for days after the rape. From that evidence, a rational trier of fact, applying their common sense and experience, could reasonably find that A.U. suffered serious physical injury.

### 2. Prosecutorial Misconduct

Spitzer argues that the prosecutor engaged in misconduct during closing argument. According to Spitzer, the prosecutor urged the jury to put itself in A.U.'s shoes, referred to matters outside the evidence, and denigrated him. We agree the prosecutor's comments were improper but conclude they were not so flagrant and ill intentioned that they caused an enduring and resulting prejudice that the trial court could not have neutralized by an admonition to the

jury.[5]

The Sixth and Fourteenth Amendments to the United States Constitution and article I, sections 3 and 22 of the Washington Constitution guarantee the right to a fair trial. See State v. Finch, 137 Wn.2d 792, 843, 975 P.2d 967 (1999). Prosecutorial misconduct may deprive a defendant of that right. State v. Davenport, 100 Wn.2d 757, 762, 675 P.2d 1213 (1984).

To prevail on a claim of prosecutorial misconduct, the defendant must establish that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and the circumstances at trial. State v. Thorgerson, 172 Wn.2d 438, 442, 258 P.3d 43 (2011). "Prejudice" means that there is a substantial likelihood that the misconduct affected the jury's verdict. Id. at 442-43. But when, as here, a defendant does not object to alleged misconduct, he waives any error unless he can show that the conduct was "so flagrant and ill intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury." Id. at 443 (quoting State v. Russell, 125 Wn.2d 24, 86, 882 P.2d 747 (1994)).

Generally, we reverse convictions based on flagrant and ill-intentioned misconduct in only " 'a narrow set of cases where we [are] concerned about the jury drawing improper inferences from the evidence.' " State v. Loughbom, 196

---

[5] The State argues that "[a]s an initial matter," if we determine that the prosecutor's closing argument "was not flagrant and ill-intentioned misconduct, then [our] examination is foreclosed" because Spitzer's failure to assign error to the court's denial of his motion for a new trial precludes him from challenging the trial court's conclusion that the comments were not prejudicial. But Spitzer designated for appeal his judgment and sentence, which "brings up for review the ruling of the trial court . . . deciding a timely motion based on . . . CrR 7.5 (new trial)." RAP 2.4(f)(5). As a result, we address Spitzer's argument on the merits.

Wn.2d 64, 74, 470 P.3d 499 (2020) (quoting In re Pers. Restraint of Phelps, 190 Wn.2d 155, 170, 410 P.3d 1142 (2018)). Those cases typically involve "comments alluding to race or a defendant's membership in a particular group, or where the prosecutor otherwise comments on the evidence in an inflammatory manner." Phelps, 190 Wn.2d at 170. Our analysis focuses " 'on whether the resulting prejudice could have been cured.' " Loughbom, 196 Wn.2d at 74-75 (quoting State v. Emery, 174 Wn.2d 741, 762, 278 P.3d 653 (2012)). That is, " 'whether the defendant received a fair trial in light of the prejudice caused by the violation of existing prosecutorial standards and whether that prejudice could have been cured with a timely objection.' " Id. at 75 (quoting State v. Walker, 182 Wn.2d 463, 478, 341 P.3d 976 (2015)).

The State has wide latitude in closing argument and may draw reasonable inferences from the evidence. Thorgerson, 172 Wn.2d at 448. The State may properly reference "the heinous nature of a crime and its effect on the victim." State v. Claflin, 38 Wn. App. 847, 849-50, 690 P.2d 1186 (1984). But it is improper for prosecutors to appeal to the jury's passion and prejudice through inflammatory rhetoric. State v. Gregory, 158 Wn.2d 759, 808, 147 P.3d 1201 (2006); State v. Belgarde, 110 Wn.2d 504, 507-08, 755 P.2d 174 (1988). We consider a prosecutor's comments in the context of the entire case. Thorgerson, 172 Wn.2d at 443.

> Spitzer contends the prosecutor committed misconduct by arguing that
>
> what we see here is the personification of every person's worst nightmare: That you will pass somebody on the street and they will decide to hurt you, not because of who you are, not because of

what you believe or what you've said or what you've done, but simply because you're there.

And that

the very personification of the nightmare that [A.U.'s] father told her about and that [A.U.] worried about when a man she didn't know passed her on the street and was looking at her came true. That nightmare's name is James Spitzer, and he is sitting in that chair.

The prosecutor's comments were improper. Characterizing the rape as "every person's worst nightmare" and describing that nightmare in the second person as "you will pass somebody on the street and they will decide to hurt you . . . simply because you're there" communicates to the jury that what happened to A.U. could also happen to them. And identifying Spitzer as "the very personification of [that] nightmare" communicates that the jury should fear Spitzer as the person who could inflict that nightmare. These comments did not emphasize evidence submitted at trial or relate to an element of the charged crime. And they go beyond a simple reference "to the heinous nature of a crime and its effect on the victim." Claflin, 38 Wn. App. at 849-50.

The State argues that the prosecutor's comments were proper because they related to A.U.'s credibility—that "she was frightened by [Spitzer] and compelled into sexual intercourse."[6] According to the State, the prosecutor used "only descriptive, vivid language so as to enable the jury to adequately appreciate the fullness of [A.U.'s] fear." But the prosecutor did not describe the evidence as A.U.'s worst nightmare. Instead, the prosecutor referred to the incident as "every person's worst nightmare." This necessarily includes

---

[6] The State makes this argument in support of its cross appeal of the trial court's finding of prosecutorial misconduct when it denied Spitzer's motion for a new trial.

11

members of the jury.  The comments were inflammatory and appealed to the jury's passion and prejudice.[7]  Belgarde, 110 Wn.2d at 507-08.

Citing Claflin and State v. Pierce, 169 Wn. App. 533, 280 P.3d 1158 (2012), Spitzer argues that the prosecutor's improper comments amount to reversible error.[8]  In Claflin, the State accused the defendant of molesting several young girls.  38 Wn. App. at 848-49.  In closing argument, over defense objections, the State read a poem by an anonymous rape victim to show " 'most poignantly' " how one of the young girls " 'probably felt.' "  Id. at 849.  Division Two of our court concluded that the poem was an improper comment because it appealed to the jury's passion and prejudice and alluded to matters outside the evidence.  Id. at 850-51.  The court explained that reading a poem with "vivid and highly inflammatory imagery in describing rape's emotional effect on its victims" was unduly prejudicial given the charges.  Id. at 850.  This was particularly true because "the poem contained many prejudicial allusions to matters outside the actual evidence against [the defendant]."  Id. at 851.

In Pierce, the State charged the defendant with two counts of aggravated first degree murder.  169 Wn. App. at 540.  In closing argument, the prosecutor invented a first-person narrative of the defendant's thoughts just before the crime, fabricated a description of the murders, and "argued about how

---

[7] As a result, we reject the State's cross appeal that the trial court erred in finding the prosecutor's comments were improper.

[8] Spitzer also cites In re Personal Restraint of Parker, No. 45163-8-II (Wash. Ct. App. July 21, 2015) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2045163-8-II%20%20Unpublished%20Opinion.pdf.  There, we concluded the prosecutor's repeated request that the jury " 'imagine [the victim's] terror' " and repeated characterization of the incident as "a 'waking nightmare' " amounted to an improper appeal to the jury's passion and prejudice.  Parker, No. 45163-8-II, slip op. at 13.

unexpected the crimes must have been for the victims." Id. at 541-43. The defendant objected to most of the prosecutor's comments. Id. Division Two of our court determined those comments improperly appealed to the passion and prejudice of the jury and referred to facts outside the evidence. Id. at 556. The court concluded that "[t]aken together, there is more than a substantial likelihood that the above three improper arguments affected the verdict." Id.

Unlike the defendants in Claflin and Pierce, Spitzer did not object to the prosecutor's improper comments. Had Spitzer objected to the prosecutor's reference to the crime as "every person's worst nightmare," the court could have admonished the prosecutor and instructed the jury to disregard the statement. We presume that jurors follow the court's instructions. See Phelps, 190 Wn.2d at 171-72 (concluding there was no reversible prosecutorial misconduct because the defendant "has not shown any prejudice incurable by a jury instruction," since "[c]losing arguments are not evidence, and the jury here was given an instruction to that effect"). And here, while the comments improperly appealed to the jurors' passions and prejudices, they were isolated, did not refer to matters outside the evidence, and were not cumulative of other acts of misconduct.

Still, Spitzer contends that a curative instruction would not have been enough to alleviate prejudice because "the case ultimately came down to [A.U.]'s credibility." But the record shows the State presented significant physical and testimonial evidence that corroborated A.U.'s testimony. Security camera video footage from a strip mall showed Spitzer pass A.U. in a cross walk, turn around when he reached the other side of the street, then walk back across the street to

follow A.U. Two Safeway employees testified about finding A.U. in the bathroom, nervous and shaking, and calling law enforcement. Law enforcement arrested Spitzer outside the bathroom with A.U.'s underwear, purse, and lunch bag in his backpack. Swabs taken from A.U.'s genitals matched Spitzer's DNA, and swabs from Spitzer's genitals matched A.U.'s DNA. And A.U.'s injuries tracked her description of Spitzer hitting her over the head hard enough to knock her to the ground and raping her for hours in the woods—a hematoma on the crown of her head and bruising, abrasions, and pain all over her body, especially her head and genitals.

Looking at the entire record, this is not a case in which the prosecutor's two improper comments during closing argument could easily serve as the deciding factor affecting the jury's verdict.[9] As a result, we reject Spitzer's prosecutorial misconduct claim.

3. Nevada Conviction

Spitzer argues the trial court improperly included a prior Nevada conviction for burglary in his offender score. We agree.

We review offender score calculations de novo. State v. McCorkle, 88 Wn. App. 485, 493, 945 P.2d 736 (1997), aff'd, 137 Wn.2d 490, 973 P.2d 461 (1999). Under the Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW, we calculate offender scores to determine a defendant's sentencing range. State v. Olsen, 180 Wn.2d 468, 472, 325 P.3d 187 (2014). "The offender score is the

---

[9] Contra State v. Walker, 164 Wn. App. 724, 738-39, 265 P.3d 191 (2011) (concluding a prosecutor's "frequent[ ]" improper comments were prejudicial because there were significant disputed facts and the case "was largely a credibility contest").

sum of points accrued as a result of prior convictions." Id. Under the SRA, the State must prove the existence of prior felony convictions by a preponderance of the evidence. RCW 9.94A.500(1). An out-of-state conviction counts toward the offender score if the trial court determines it is comparable to a Washington offense that the court would have included in the offender score had the crime occurred in Washington. RCW 9.94A.525(3). The State bears the burden to show that out-of-state convictions exist and are comparable. Olsen, 180 Wn.2d at 472.

Our Supreme Court established a two-part test to determine the comparability of an out-of-state conviction. State v. Thiefault, 160 Wn.2d 409, 415, 158 P.3d 580 (2007). First, the sentencing court determines whether the offense is legally comparable; that is, "whether the elements of the foreign offense are substantially similar" to those of the comparable Washington offense. Id. If the elements are substantially similar under the legal prong, the inquiry ends, and the court may include the conviction in the offender score. See Id.; Olsen, 180 Wn.2d at 472-73. But if the elements of the foreign offense are broader than the Washington counterpart, the court must look to whether the offense is "factually comparable." Thiefault, 160 Wn.2d at 415. An offense is factually comparable if the State proves the defendant's conduct underlying the foreign offense would have also violated the comparable Washington statute. Id. If an out-of-state conviction involves an offense that is neither legally nor factually comparable to a Washington offense, the sentencing court may not include that conviction in the defendant's offender score. Id.

Spitzer contends that his Nevada conviction for burglary, committed September 9, 2010, was not legally or factually comparable to burglary in Washington. In Nevada,

> [a] person who, by day or night, enters any house, room, apartment, tenement, shop, warehouse, store, mill, barn, stable, outhouse or other building, tent, vessel, vehicle, vehicle trailer, semitrailer or house trailer, airplane, glider, boat or railroad car, with the intent to commit grand or petit larceny, assault or battery on any person or any felony, or to obtain money or property by false pretenses, is guilty of burglary.

Former NEV. REV. STAT. (NRS) 205.060(1) (2005). And in Washington, a person

> is guilty of burglary in the first degree if, with intent to commit a crime against a person or property therein, he or she enters or remains unlawfully in a building and if, in entering or while in the building or in immediate flight therefrom, the actor or another participant in the crime (a) is armed with a deadly weapon, or (b) assaults any person.

RCW 9A.52.020(1).

Spitzer argues the Nevada statute is broader, and thus not legally comparable, because " '[u]nlawful entry or remaining' was not an essential element of the crime of burglary in Nevada." The State agrees. Because the Washington statute contains a different, more specific element than the Nevada statute, we too conclude that Spitzer's Nevada burglary conviction is not legally comparable to burglary in Washington. So, we next consider whether the crimes are factually comparable.

In making a factual comparability determination, " '[t]he key inquiry is whether, under the Washington statute, the defendant could have been convicted if the same acts were committed in Washington.' " State v. Davis, 3 Wn. App. 2d 763, 778, 418 P.3d 199 (2018) (quoting State v. Thomas, 135 Wn. App. 474,

16

485, 144 P.3d 1178 (2006)). We consider " 'only facts that were admitted, stipulated to, or proved beyond a reasonable doubt.' " Id. at 771-72 (quoting Olsen, 180 Wn.2d at 478). And " '[w]hile the sentencing court can examine the indictment or information as evidence of the underlying conduct, [facts relating to] the elements of the crime remain the focus of the analysis.' " Id. at 778 (quoting Thomas, 135 Wn. App. at 485). That is because where the elements of the foreign crime are broader, there may be no incentive for a defendant to attempt to prove that he did not commit the more narrow offense. See In re Pers. Restraint of Lavery, 154 Wn.2d 249, 257, 111 P.3d 837 (2005).

The State contends that the Nevada burglary conviction is factually comparable because Spitzer entered a Nevada plea agreement "in which he admitted to facts as they were described in the charging document," and the charging document included an admission that he "willfully and unlawfully" entered the victim's residence. Spitzer contends that because "Nevada did not need to prove 'unlawful entry or remaining' in order to get a conviction," we cannot rely on that language to support factual comparability. We agree with Spitzer.

Spitzer's Nevada guilty plea agreement says, "I hereby agree to enter a plea of guilty to . . . one count BURGLARY . . . as is more fully alleged in the charging document." And the charging document alleges that Spitzer

> willfully and unlawfully enter[ed] the residence of [R.L.], located on White River Road, in the County of White Pine, State of Nevada, without [R.L.]'s permission and with the intent to take and/or carry away property owned by [R.L.] . . . in violation of [former] NRS 205.060.

But Spitzer's plea agreement also says, "I understand that by pleading guilty I admit the facts which support all the elements of the offenses to which I now plead as set forth in the charging document." So, the facts Spitzer admitted to were only the facts that "support . . . the elements" of the Nevada burglary statute. See Davis, 3 Wn. App. 2d at 778. And unlawful entry is not one of those elements. As a result, the facts in the Nevada charging document cannot support a conviction of burglary in Washington.

The State argues that even if Spitzer did not admit to facts sufficient to support a Washington burglary conviction, "he was responsible for those acts [described in the charging document] by simply pleading guilty per operation of Nevada law." It cites Ex Parte Dickson, 36 Nev. 94, 133 P. 393 (1913), and Righetti v. Eighth Judicial District Court of State of Nevada, 133 Nev. 42, 388 P.3d 643 (2017), in support of its argument.

In Dickson, the Nevada Supreme Court held that the "effect of the plea of guilty, generally speaking, is a record admission of whatever is well charged in an indictment." 133 P. at 396. But nothing in that 110-year-old case suggests that a defendant also admits to facts sufficient to support the elements of crimes in foreign jurisdictions when pleading guilty to a charged crime in Nevada. And in Righetti, the court determined that when a charging document alleges multiple theories for a single offense, the defendant has no right to plead guilty to fewer than all the theories alleged without agreement of the State. 133 Nev. at 42-43. Again, nothing in the case holds that a defendant admits to facts in a charging document unrelated to an element of the charged crime.

Because Spitzer admitted to only the facts that supported the elements of burglary in Nevada, there is no factual comparability, and we remand for resentencing with a corrected offender score.[10]  See Davis, 3 Wn. App. 2d at 784, 793 (remanding for resentencing where foreign conviction was not factually comparable).

We conclude that sufficient evidence supports the jury finding that Spitzer inflicted serious bodily injury on A.U. and that the prosecutor's improper comments do not warrant reversal.  But because Spitzer's Nevada burglary conviction is not legally or factually comparable to burglary in Washington, we remand for resentencing.

_____
Brennan, J

WE CONCUR:

_____         _____
Hazelrigg, A.C.J                             Smith, C.J.

---

[10] Spitzer also claims ineffective assistance of counsel because his attorney failed to object to including the Nevada burglary conviction in his offender score. Because we address the issue on its merits and remand for resentencing, we do not reach Spitzer's ineffective assistance claim.